**KENTRON HAWAII, LIMITED,**
**Appellant,**

v.

**John W. WARNER, Secretary of the Navy, et al.**

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, an Unincorporated Association Local 1260, International Brotherhood of Electrical Workers, AFL–CIO, Appellant,**

v.

**John W. WARNER, Secretary of the Navy, et al.**

**Nos. 71–2038, 72–1099.**

United States Court of Appeals, District of Columbia Circuit.

June 15, 1973.

Fahy, Senior Circuit Judge, dissented and filed opinion.

David H. Lloyd, James A. Dobkin, and
Stephen M. Sacks, Washington, D. C.,

were on the brief for appellant in No. 71–2038.

Thomas X. Dunn, and Elihu I. Leifer, Washington, D. C., were on the brief for appellant in No. 72–1099.

Harold H. Titus, Jr., U. S. Atty., John A. Terry, Robert M. Werdig, Jr., and Joseph F. McSorley, Asst. U. S. Attys., were on the brief for appellee.

P. Gordon Stafford and David L. Reichardt, Washington, D. C., were on the brief for intervenor/appellee, Dynalectron Corp.

Before FAHY, Senior Circuit Judge, and ROBINSON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

This case arises on appeal from a summary judgment entered below against appellants' challenge to the award of a negotiated cost-plus-award-fee government contract. The service contract involved here provides for the operation and maintenance of the Pacific Missile Range Facility (PMR).[1] Appellant Kentron Hawaii, Limited (Kentron) was the previous incumbent contractor and is a disappointed bidder for contract renewal.[2] Appellant International Brotherhood of Electrical Workers (IBEW) has represented various numbers of employees at PMR both before and after the contract award challenged here. Intervenor-appellee Dynalectron Corporation (Dynalectron) was the successful bidder, and is currently performing at PMR, having been awarded the contract by the Navy Regional Procurement Office, Los Angeles (Navy) on 21 May 1971.

Appellants claim that the contract was illegally awarded. They seek both reversal of the summary judgment granted on appellee Navy's cross-motion below and grant of a motion for summary judgment on their own behalf.[3]

Ever since Scanwell Laboratories, Inc. v. Shaffer,[4] those adversely affected by the award of government contracts have had standing to challenge the legality of procurement decisions. However, they bear a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis,[5] or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.[6]

There are two principal grounds for appellants' challenge. First, they claim that the contracting officer's acceptance of Dynalectron's bid was improper. That argument variously turns on allegations that the successful bid was nonresponsive, unfeasible and illegal. Second, appellants urge that the Labor Department's failure to make a wage determination, allegedly in violation of the Service Contract Act, fatally flawed the contract award. They ascribe error either directly to the Labor Department's decision, based on information available to it, or indirectly to the Navy's failure to forward adequate wage data. Since we find none of these arguments persuasive, we affirm the decision of the District Court.

---

1. The contract required performance at the Navy's Pacific Missile Range sites for a period of three years, with one two-year extension option. The sites to be served were located at Barking Sands, Hawaii; Pt. Allen, Hawaii; Pt. Mugu, California; Wake Island; Midway Island; Johnston Atoll; and the USN Wheeling (a Navy tracking vessel).

2. Kentron had been the service contractor at PMR for ten years prior to the expiration of its contract on 31 July 1971.

3. Appellants' complaints and motions for summary judgment seek both termination of the Dynalectron contract and either reaward to Kentron or resolicitation.

4. 137 U.S.App.D.C. 371, 424 F.2d 859 (1970).

5. See M. Steinthal & Co. v. Seamans, 147 U.S.App.D.C. 221, 233, 455 F.2d 1289, 1301 (1971).

6. See Wheelabrator Corp. v. Chafee, 147 U.S.App.D.C. 238, 244, 455 F.2d 1306, 1312 (1971).

*I. Facts*

The predecessor PMR service contract, performed by Kentron, had an expiration date of 31 July 1971. Preparations for the award of a successor contract began with the forwarding of a requisition from PMR to the Navy on 6 May 1970.

As early as 29 July 1970 Kentron requested the Navy to procure an area wage determination from the Labor Department, pursuant to the Service Contract Act of 1965, 41 U.S.C. § 351 et seq. On 5 August 1970 the Navy, as required by § 12–1005 of the Armed Services Procurement Regulations,[7] submitted a Standard Form 98 (entitled "Notice of Intention to Make a Service Contract") to the Wage and Hour Division of the Department of Labor.

Two items of ultimate controversial importance must be noted here. First, although Item 7 of the SF 98 instructed the Navy to enclose "whatever information [was] readily available on wages and fringe benefits being paid in the locality," *no wage information* of that nature was ever forwarded. Second, the Department of Labor decided not to make a wage determination. On 3 September 1970 a report from the Labor Department advised the Navy that *no pre-existing wage determination* was applicable to any of the labor categories at any of PMR's scattered locations, and that *no new wage determination* would be issued. On 15 October 1970 Kentron was so notified.

In the meantime, the Navy had issued a solicitation for the PMR service contract. Twenty-one firms responded, and the sixteen considered potentially qualified were issued Requests for Proposals.[8] Initial responses were submitted on 26 October 1970. Thereafter, the Navy's analysis and further negotiations narrowed the field of competitors to three remaining companies: Kentron, Dynalectron, and Bendix Corporation.

During this entire period labor organization had been going on among Kentron's employees. By December 1970, in addition to the 23 employees previously represented by the Inland Boatman's Union, 57 employees had accepted IBEW as their bargaining representative. The Navy decided to deal with this unstable situation (1) by warning the prospective contractors to take account of possible unionization, and (2) by insisting, by way of an amendment to the Request for Proposals on 1 March 1971, that the proposals specify firm maximum wage rates, beyond which the Government would not be obligated to reimburse the service contractor ultimately selected.

On 19 March 1971 the three competitors submitted their best and final offers. By 1 April 1971, 234 of the 375 employees at PMR had been organized.[9] After the Navy completed cost analyses and evaluations which rated all three competitors as equally technically qualified, on 21 May 1971 the contract was awarded to Dynalectron "on the basis of the lowest potential cost exposure to the Government."[10]

On 22 May 1971 Kentron protested the award of the contract to the Comptroller General. On 3 June 1971 IBEW also filed a protest. The Comptroller General issued his opinion, No. B–173061, denying both protests, on 30 July 1971. On that same day Kentron and IBEW filed their complaints in the District Court. The cases were subsequently consolidated. Accompanying applications for temporary restraining orders were denied on 2 August 1971. On 1 December 1971 appellants' motions for summary judgment were denied and appellee's cross-motion for summary judgment was granted.

---

7. 32 C.F.R. § 12.1005 (1972).

8. These were released on 21 August 1970.

9. Joint Appendix (hereafter "J.App.") at pp. 51 and 53.

10. The Navy evaluated the cost of the various proposals for a five-year period as follows: Dynalectron, $26,252,141.00; Bendix, $28,492,502.00; and Kentron, $29,043,349.00. J.App. at p. 143.

## II. *Acceptance of Dynalectron's Proposal*

### A. *Non-responsiveness*

Kentron suggests that the contracting officer had a duty to reject Dynalectron's bid as non-responsive to the Request for Proposals. Specifically, they complain that Dynalectron offered first-year maximum wage rates which were generally lower than those actually paid by Kentron immediately prior to the termination of its contract.[11] When the Navy amended the Request for Proposals to urge all bidders to take the possibility of unionization into account, Kentron responded by increasing its proposed maximum wage rates.[12] They are essentially now contending that such a decision to *increase* maximum government-reimbursable costs above current levels was the only reasonable and responsive approach.

Since this was not an advertised sealed-bid procurement, the concept of "responsiveness" does not carry the strict overtones here which it would in that context. In negotiated procurements, the very concept of responsiveness is a subject of negotiations. However, even if a strict and technical interpretation of that concept were to be applied here, Dynalectron's bid is in fact responsive to the precise and specific requirements of the amended Request for Proposals.

The Navy RFP directed that "maximum labor rates should contain *any cost contingency you consider necessary* with due regard to unionization activities in progress and/or pending . . . . ." (Emphasis added.) Further, an "essential" requirement specified that all offerers had to propose "firm maximum average labor rates." The RFP stated that "[a]ny proposal not complying with this requirement [*i. e.*, provision for firm maximums] is not acceptable."[13] No set minimum wage levels were specified.[14]

Kentron contends that it was fundamentally unfair to award the contract to an offerer whose judgment as to the likely outcome and consequences of the current unionization activity differed from its own. We do not agree. The essence of any procurement process is that competing offerers must at some point make independent business judgments and stick by them. In a negotiated procurement, once every competitor knows what factors are to be taken into consideration, it is the very difference between one offerer's judgment and that of another which allows the contracting officer to choose the proposal most advantageous to the Government. The propriety of soliciting divergent opinions is particularly obvious in cases where, as here, the very structure of the contract insures that an error in judgment in the accepted proposal will redound solely to the harm of the contractor. If unionization did force Dynalectron's actual wage rates above the proposed maximums, the resulting "cost overrun" would still *not* be *reimbursable.*

11. Dynalectron's bid was based on maximum labor rates which averaged $0.13 lower per hour than the actual average wages paid by Kentron at the time its contract was terminated.

12. Since wage rates were the major cost component, this decision clearly lost the contract for Kentron.

13. The amended Request For Proposals stressed that "[e]valuation [sic] of your best and final offer will be heavily cost oriented in terms of maximum cost exposure to the government." It further provided, "Note::: Award may be made without further discussion of proposals received: Therefore, proposals should be submitted on the most favorable terms from a price and technical standpoint which the offeror can submit to the government." J.App. at p. 63.

14. In a post-negotiation clearance, No. LA–11020.1 on 5 May 1971, the Navy specifically noted that, under the circumstances surrounding the PMR contract, "the wage rate aspects of cost proposals can vary widely as each contractor assesses his prospects of arriving at a labor settlement, which except for the incumbent could even include possible avoidance of unionization of the labor force." J.App. at 143.

Acceptance of Kentron's argument would entail either (1) an artificial result dictated by a non-Service Contract Act minimum wage level set at Kentron's current actual rates,[15] or (2) constant renegotiation until all offerers proceeded on the same assumptions. Under either of those scenarios, Kentron, as the incumbent contractor facing no phase-in costs, would inevitably have a built-in advantage. Procurement negotiations would become a costly, ill-attended and meaningless formality; here, Kentron could confidently expect to retain its contract indefinitely. That result would hardly be fair to competitors willing to take reasonable risks of cutting into their own profit.

B. *Feasibility*

 Even though Dynalectron's proposal was responsive on its face, the contracting officer retained discretion to reject it as unrealistic. Kentron argues that he abused his discretion in this case by failing to do so. Since decisions on cost realism and feasibility are squarely within the area of the contracting officer's expertise,[16] this court cannot second-guess such a determination unless it is not supported by any reasonable basis. Conversely, in order to prevail on this ground, Kentron would have to demonstrate that the contracting officer could *only* reasonably have concluded that Dynalectron's proposal was not feasible. Since no one has contended that potential "cost-overruns" were likely to drive Dynalectron into bankruptcy, Kentron's argument of unfeasibility must rest on the assertion the Dynalectron's bid

would inevitably cause labor strife serious enough to interfere with performance of the service contract.

As of the time of the contract award, Kentron's dire predictions were merely self-serving speculations with which the contracting officer could reasonably disagree. Unionization was proceeding, but the extent of its ultimate success was largely unpredictable. If the contracting officer based his decision on the assumption that unionization would totally fail, or if that scenario were necessary for the success of Dynalectron's proposal, then we would be forced to label his decision unreasonable. However, even if successful unionization is taken into account, a prediction of crippling labor strife would remain highly speculative.

Presumably, newly unionized employees would be quite likely to press for higher wages. Labor strife might result if those demands were not met; but then again it might not. Indeed, if the labor relations at PMR had turned as sour as Kentron suggests, the contracting officer might reasonably have concluded that a confrontation and work stoppage was inevitable, no matter who obtained the contract award.

Dynalectron's proposal did take the likelihood of rising wage rates into account. It contained an annual wage escalation rate of 1.8% per year—which represented an increase over the 1.4% figure used by Kentron during the ten years of its prior performance. In addition, the proposed maximum wage rates only set the limit for government reim-

15. The Comptroller General has "adhered to the principle that contract [wage] stipulations tending to restrict competition and to increase the cost of performance are unauthorized unless reasonably requisite to the accomplishment of the legislative purpose of the contract appropriation involved, or unless such stipulations are expressly authorized by statute. . . ." Secretary of Defense, 42 Comp.Gen. 1, 2 (1962).

16. The Comptroller General takes the position that "the award of cost reimburse-

ment contracts requires exercise by procurement personnel of informed judgments whether submitted proposals are realistic as to proposed costs as well as to technical approach" and that such judgments "properly should be left to the discretion of the contracting agencies concerned since they are in the best position to assess 'realism' of costs . . . and must bear the major criticism for any difficulties or expenses experienced by reason of a defective cost analysis." Trans World Airlines, Inc., 50 Comp.Gen. 592, 600 (1971). We wholeheartedly agree.

bursement. There was nothing to indicate that Dynalectron, with one eye on its reputation as a competent government contractor, might not yield to some union pressure and assure continuing performance by cutting into its own profit margin and raising actual wages above the reimbursable maximum.

Finally, even if the contracting officer could only reasonably foresee great union pressure, and limited contractor ability to absorb higher costs, an effective work stoppage was still not the only reasonably predictable result. Dynalectron is a service company of long standing and with much experience. It had specialized staffs and personnel rosters of its own, so that it was not necessarily dependent on the willingness of incumbent workers to transfer to its payroll.[17] While not overwhelmed with the contracting officer's prescience,[18] nor willing to say that we would have come to the same conclusions in the first instance, this court must agree with the District Court's finding that, given the information available to him at that time, the contracting officer could reasonably believe Dynalectron's assurances of satisfactory performance.

### C. *Illegality*

Appellants further assert that Dynalectron's proposal was illegal in that it postulated a violation of the "successor employer" doctrine and made violation of the National Labor Relations Act in-

evitable. If that were the case, award of the contract would obviously have been improper.

■■ To the extent that the successor employer doctrine might in some instances require a new employer like Dynalectron to honor the collective bargaining agreement of its predecessor, this argument fails on two grounds. At the time the contract was awarded, this aspect of the doctrine did not apply to government contractors.[19] In addition, there simply was no existing collective bargaining agreement to be honored.[20]

■ Arguably, the successor employer doctrine might have applied to require Dynalectron to engage in good faith bargaining with the employees' representatives before effecting a unilateral change in their terms and conditions of employment. Although the determination of whether or not Dynalectron would in fact be classifiable as a "successor employer" would have been highly technical, and arguably difficult to make accurately at the time of the contract award, we find no inherent illegality in Dynalectron's proposal even if we proceed on the premise that the contracting officer should have anticipated application of the doctrine, plus a requirement of good faith bargaining, in this case.

Kentron's position that a refusal to bargain in good faith would necessarily occur is, once again, purely an exercise

17. J.App. at pp. 105–06.

18. At page 24, footnote 20, of its reply brief, Kentron apologetically goes outside the record to point out that PMR was shut down by a strike from 28 February 1972 to 10 April 1972. Even if the record contained details concerning that work stoppage, and it were shown to stem solely from Dynalectron's proposed rates, that would not alter our conclusion that this possibility was highly speculative *at the time the contract award was made.*

19. See William J. Burns International Detective Agency v. NLRB, 441 F.2d 911 (2d Cir. 1971), upheld as to this ground, 406 U.S. 272 (1972); Emerald Maintenance Inc., 188 NLRB No. 139 (1971);

Trans World Airlines, Inc., 50 Comp. Gen. 592 (1971). Since the time of this contract award, the Service Contract Act has been amended by Act of 9 October 1972, Pub.L.No.92–473, 86 Stat. 789, to provide that previous collective bargaining agreements will set a lower limit on the successor's actual wages and fringe benefits, unless the Secretary of Labor finds these to be substantially at variance with prevailing rates.

20. Twenty-three of Kentron's employees were represented by the Inland Boatman's Union, which did have a collective bargaining agreement with the company. However, the IBU contract terminated with the expiration of Kentron's service contract.

in speculation. Dynalectron's plan did envision some efforts to avoid unionization; but it simply did not postulate disobedience to legal duty should that eventuality occur. Certainly the duty to bargain in good faith does not include a duty to raise, or even stabilize, wages.

Kentron attempts to buttress its claim by pointing out that there was indeed a subsequent refusal to bargain which required NLRB intervention. Even if the perspective of hindsight could be properly used to judge the contracting officer's decision, it should be noted that the NLRB issued a bargaining order to remedy that situation. Dynalectron has agreed to comply with that order.[21] If anything, subsequent events have provided a clear demonstration that Dynalectron's plan was not dependent on "destruction" of the unions and that good faith bargaining is not inconsistent with continuing performance of the contract under Dynalectron's proposed terms.

III. *Failure To Issue a Wage Determination*

Appellants' second major claim is that the contract award was fatally flawed by failure to comply with the Service Contract Act of 1965.[22] The Act requires that, subject to certain exceptions, every covered service contract must contain a provision specifying the minimum wages and fringe benefits to be paid to the various classes of service employees performing thereunder. These minimum conditions are to be set by the Secretary of Labor, or his authorized designee, in the form of a "wage determination." Wage determinations are to be made "in accordance with prevailing rates for such employees in the locality, which in no case shall be lower than [$1.60 per hour]."[23] No wage determination was

ever issued to cover the service contract in this case.

■ Appellants' claim of error is really twofold in nature. First, they claim that, even on the basis of the information available to it, the Labor Department in this case abused its limited discretionary power to exempt certain contracts from the requirements of the Service Contract Act. Second, they argue that the Navy violated the clear mandate of the Act by failing to forward wage information which was "readily available." Since they contend that this unforwarded information could have affected the Labor Department's decision not to issue a wage determination, the Navy's violation of this ministerial duty is claimed to rise to the level of a fatal procedural irregularity.[24]

A. *The Labor Department's Decision*

James Hall, Deputy Assistant Administrator of the Wage and Hour Division, Employment Standards Administration, made the decision not to issue a wage determination covering the PMR service contract. He did so pursuant to the statutory exemption clause,[25] which permits the Department of Labor to "provide such reasonable limitations" and "make such rules and regulations allowing reasonable variations, tolerances and exemptions to and from any and all provisions of this chapter [the Service Contract Act] as he may find *necessary and proper in the public interest* or *to avoid serious impairment of the conduct of Government business.*"

We agree with the District Court that this authority to grant exemptions cannot be given the broad reading which appellees seek and which the Comptroller General, and the Labor Department, have given it in the past.[26] The imple-

---

21. J.App. at p. 211.

22. 41 U.S.C. §§ 351–58 (1970).

23. 41 U.S.C. § 351(a)(1) (1970).

24. We agree with the appellants' argument that, if prejudicial procedural error is shown, the identity of the government

agency which made the error is irrelevant. See S & E Contractors, Inc. v. United States, 406 U.S. 1, 17, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972).

25. 41 U.S.C. § 353(b) (1970).

26. See Refuse Service Inc., 46 Comp.Gen. 278 (1966).

menting Labor Department regulation exempts all contracts from the statutory requirement that they contain minimum wage data reflecting a wage determination if, in fact, no wage determination has been issued for any of the classes of employees involved at that "locality."[27] Standing alone, this regulation seems reasonable enough; for it only excuses failure to comply with an impossible requirement. However, neither this regulation nor any other sets standards governing the Labor Department's basic decision on whether to issue a wage determination in the first place.

The Service Contract Act clearly did not intend to leave solely to the whim of the Labor Department the important decision not to issue a wage determination in any given case. If the statute is not to be swallowed by the exemption clause, this decision must itself be guided by the standards which that clause sets forth. The Labor Department's failure to reiterate these standards in a special regulation cannot avoid

their application to each and every concrete decision. To the extent that the Comptroller General's decision implies that the Labor Department has unlimited discretion in deciding whether to issue a wage determination, we must join the District Court in holding to the contrary.[28]

On the other hand, the corollary of the view that such discretion is limited is that the Labor Department does have authority to withhold a wage determination in some cases. By the terms of the statute itself, those cases include instances in which refusal to issue a wage determination is justified as necessary and proper in the public interest or to avoid serious impairment of government business. Even under a restricted reading of these standards, this service contract was a prime candidate for exercise of the exemption power.

There has been considerable dispute over exactly why Hall decided not to issue a wage determination. Since there is conflicting evidence as to some of the

27. 29 C.F.R. § 4.5(b) (1972) provides: "To avoid serious impairment of the conduct of Government business, it is hereby found necessary and proper to provide exemption . . . [from the determined wage and fringe benefits section of the Service Contract Act] . . ., but not the minimum wage specified under section 6(a)(1) of the Fair Labor Standards Act of 1938, as amended, . . . of all contracts for which no such wage or fringe benefit has been determined for any class of service employees to be employed thereunder . . . . ."

28. Congress has noted and dealt with the problem presented by the Labor Department's tendency towards over-expansive reading of the statute's exemption power. After special oversight hearings, Public Law No. 92–473 was passed on 9 October 1972. It amends the Service Contract Act to label specifically the two previous statutory standards for exemption as "special circumstances" and adds the further qualification that the Secretary must determine that the "limitation, variance, tolerance or exemption . . . is in accord with the remedial purpose of this Act to protect prevailing labor standards." In addition, the exemption section was qualified to provide that it could not be in-

voked to avoid another new provision requiring wage determinations to be made with regard to all service contracts employing 25 or more employees by 30 June 1973 (and reducing that threshold number in stages of 5 to a limit of 5 through successive years). This strict new amendment grew from the Service Contract Act's authors' frustration and anger at the sight of "the Secretary of Labor's discretion in administering the act . . . [being] stretched . . . [over the years] far beyond what the Congress had intended." H.Rep.No.1251, 92nd Cong., 2d Sess., p. 3 (1972), U.S.Code Cong. & Admin.News 1972, p. 3534. Representative O'Hara went so far as to expound that the government agencies involved had "seemed to overlook no opportunity to render the act nugatory." 118 Cong.Rec., H7262 (daily ed., 7 Aug. 1972). However, even if failure to issue wage determinations for two thirds of the contracts subject to the Act was an abuse of discretion, we hold that the contract before us was a prime candidate for exemption. The decision here was rationally aimed at concentrating resources better to fulfill the legislative purpose, not at avoiding use of those resources whenever possible.

alleged reasons, Kentron argues that, at the very least, a remand for trial is in order to resolve this factual question. To the contrary, careful scrutiny has convinced us that all of the alleged reasons which are potentially supportable by probative evidence fit within the statutory standards. Conversely, we perceive no genuine issues of material fact as to the nonexistence of those alleged reasons which would not have been permissible under the statute.

■ Whichever set of motives is selected from among those for which evidence exists, Hall's decision was within the proper range of his discretion. Determining exactly which motive dominated would be an unnecessary exercise. Therefore, the existence of some unresolved factual disputes as to exactly which of these motives were operative does not preclude our affirmance of the District Court's grant of summary judgment.

By his own admission, Hall's decision not to issue a wage determination involved "a variety of considerations." [29] However, in order to provide a general focus for our discussion, we must stress that his justification revolved primarily around his desire to properly allocate scarce Labor Department resources.[30] This motivation permeated what in reality were three separate decisions. Three distinct types of wage determination could have been issued: a complete wage determination covering all the relevant labor categories and establishing minimums for the general area; a partial wage determination covering only some labor categories but, as to those, establishing minimums for the general area; and a wage determination setting minimums solely for the employees in PMR's scattered enclaves. We must separately analyze Hall's decision as to each one of these three possibilities.

### 1. Failure to Issue a Complete Area Wage Determination

Appellants admit that Hall had in his possession a very limited amount of information concerning wage rates prevailing in the general localities surrounding PMR's sites. That data was only sufficient to support a wage determination covering about one third of the employees.[31] With regard to a general area wage determination, Hall's decision not to proceed stemmed from his reluctance to commit the staff which would have been necessary to compile further data.

During the relevant period, the Department of Labor was receiving about 24,000 Standard Forms 98 per year. Because it was physically impossible to do more with thoroughness and accuracy, the Department responded with wage determinations for about 40 percent of these.[32] If the statutory exemption standards allowed for such internal allocation of Labor Department resources under any circumstances, then that sort of decision seems eminently reasonable here. The Pacific Missile Range service contract involved relatively few employees, a great diversity of job classifications, and a wide geographical distribution of employment sites. Hall decided that the staff resources which would have been required for an adequate survey were far out of proportion to potential benefits and could be much more ef-

29. See J.App. at p. 87.

30. Hall stressed that he acted under Department policy "not to use its resources to issue determinations where the cost involved is high in comparison to the results, taking into account such factors as the number of employees and the availability of wage data." Hall Deposition at p. 56. He summed up his "statement of reasons" by saying that, taking all the various factors into account, he had "con-cluded that this was a case in which we would not be justified in expending our limited resources in staff and money." J.App. at p. 90.

31. See Hall Deposition at pp. 19, 167 and 182.

32. Hall Deposition at p. 87. See also J. App. at pp. 87, 206. Hall had a total staff of eighteen, including clerical employees. Hall Deposition at p. 7.

fectively employed elsewhere.[33] Even if we could review his decision *de novo*, we would agree.

■ Furthermore, we hold that the statutory exemption standards *did* give the Labor Department discretion to allocate its own resources in this fashion. Such allocation actually furthered the purpose of the statute and, in effect, constituted a determination that such action was "necessary and proper in the public interest." [34] Since the statute itself both assigns an "enormous regulatory task" and tempers that assignment with broad language authorizing exemptions where necessary, this court will uphold the Department's discretionary decision, in this case, to focus scarce resources on key problem areas in order that the basic statutory purpose could be fulfilled.[35]

### 2. *Failure to Issue a Partial Wage Determination*

Appellants argue that Hall could still have issued a wage determination covering those labor categories for which he had enough data. Then, they urge, the Navy could have interpolated wage rate minimums for the remainder of the employees. Indeed, they charge that the real, but improper, reason for his decision was his reluctance to inject the Navy into this process of interpolation.

If any evidence indicated that Hall decided not to make a wage determination on that ground, we would be compelled to remand for resolution of that factual issue by trial.[36] If Hall acted as he did

33. Hall stated that he "had concluded that we would have to make a survey to get information that we could rely on, and that in keeping with the general policy . . . of using our resources where we think it will do the most good, I had made a judgment decision here that this contract was so scattered out and that the employees many of them, were not service employees . . . that it wouldn't be worth a candle to spend the money . . . ." Hall Deposition at pp. 76–77. He pointed out that the lack of resources required an election between irreconcilable demands. Rather than "chase rates in the Pacific," he chose to concentrate instead on wage determinations likely to affect more employees, "minority groups, and . . . groups of people that are getting very low rates." Hall Deposition at pp. 174–175.

34. The District Court concluded that the Labor Department's decision to allocate its own resources was within its discretion to "avoid serious impairment of the conduct of Government business." J. App. at p. 214. Kentron has argued that this particular exemption power relates only to threats to the procuring agency's business (*i. e.*, the Navy in this case). We tend to agree with that position. However, even if a narrow construction of "Government business" is required, the Labor Department's reasonable decision to allocate scarce resources can be validated under the parallel statutory power to make exemptions which are "necessary and proper in the public interest." Since Hall's concern with allocating his scarce staff resources appears clearly from the record, and was a valid concern under the statute, we attach little importance to the fact that he verbalized his decision under the alternative statutory standard and we are not bound by the District Court's acceptance of his formulation.

35. "[O]rdinarily . . . a court cannot say that an agency makes an error of law 'in deciding how best to allocate its resources.'" Amalgamated Meat Cutters v. Connally, 337 F.Supp. 737 (D.D.C. 1971), citing Wisconsin v. FPC, 373 U.S. 294, 313–314, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963). The need for such flexibility was recognized by those opposing efforts to restrict the exemption power's scope via Pub.L.No. 92–473. See note 28, *supra*. Rep. Blackburn noted that the new amendment would threaten "the present administrative flexibility to allocate resources available for making wage determinations in those areas and contracts where substantial needs for wage and fringe benefits exist." 118 Cong. Rec. H7260 (daily ed., 7 Aug. 1972). Further, Rep. Erlenborn emphasized that "[u]nder the present law, he [the Secretary] has sufficient latitude to allocate his limited resources in the most efficient fashion, making wage determinations for those contracts with the substantial majority of workers." 118 Cong.Rec. H7261 (daily ed., 7 Aug. 1972).

36. The mere fact that Kentron alleges an improper motive on Hall's part is not enough to compel a remand. Summary judgment may be granted if there are not *genuine* issues of *material* fact, even

merely to avoid Navy interference in collective bargaining, then his decision would have to be viewed as improper.

The Navy did express the concern that interpolating rates would confuse the procurement process, which arguably could amount to "serious impairment of Government business." However, the Navy's major concern was the avoidance of "rate setting" during labor negotiations. "Rate setting" is at the core of the statute's purpose and operation. By definition, every wage determination interferes with free collective bargaining —so the prospect of "rate setting" would be most unlikely to constitute a valid ground for exemption. More importantly, there were in fact no labor negotiations in progress when Hall made his decision. Even if the Navy's squeamish concern could theoretically justify Hall's decision, it cannot do so in this case because, as articulated, it was simply based on a misapprehension of the facts.

On the other hand, the record negates any material issue of fact on this point. Nothing therein points to the Navy's concern about rate-setting as an operative reason for *Hall's* decision. The Navy has repeatedly voiced this rationale—but its views at best constitute an outsider's characterization and more accurately reflect its own reasons for not pressing the Labor Department for a different decision. Hall's subordinate Tyburski, did make some notes during this period which indicate his sympathy with the Navy's view [37]—but he did not make the decision. Hall was the official charged with making the decision; and he was the one who actually made it.

Only *his* rationale is relevant to the analysis here. The District Court had before it the best possible source of evidence on this issue—Hall's own deposition and statement of reasons. In those documents Hall flatly renounces any policy against rate setting and labels the Navy's characterization as a "misquotation." [38]

From all that appears in the record, Hall's decision not to make a partial wage determination was, again, based on a desire to allocate Labor Department resources in an effective manner. The *Navy* feared involvement in the process of "conforming" rates for two thirds of the labor categories with those set for one third by Hall. Such an interpolation would require agreement between the Navy, the contractor and the employees' representative. What *Hall* feared was the likelihood that these three parties would not be able to agree. For, if that occurred, the mandatory responsibility for interpolating rates would once again revert to his overtaxed staff. Hall was well aware that "if there was no agreement . . . [he] would again be faced with the issue." [39] He also knew that, since some of the labor categories covered by the contract would then be covered by a wage determination, determination of minimum rates for the rest of the contract employees would be mandatory. We cannot find that Hall's exercise of his discretion to deploy his resources elsewhere was without a rational basis.

3. *Failure to Issue an Enclave Wage Determination*

Finally, appellants claim that Hall should have made an "enclave" wage de-

---

though such issues are technically and formally raised in the pleadings, especially when neither party has rested on those pleadings. See Blackhawk Heating and Plumbing Co. v. Driver, 140 U.S. App.D.C. 31, 35, 433 F.2d 1137, 1141 (1970).

37. See IBEW Brief at p. A–1.

38. See Hall deposition, at pp. 142–45.

39. Hall noted that "29 CFR Section 4.6 (b) would have been applicable. This

means that the agency must, starting with the wage rates furnished, agree with the contractor and his employees (or their representatives) to wage rates which bear a reasonable relationship to the rates furnished." Hall knew that such a process might be difficult with regard to this contract involving scattered sites and "somewhat exotic job duties." J.App. at p. 90. *See also* Hall Deposition at pp. 56–57.

termination. The Service Contract Act provides for a determination of wage levels prevailing "in the locality." Under certain circumstances, the Labor Department has treated the specific enclave where a service contract is to be performed as the relevant "locality." In this event, the wage determination may be based on wage data which stems primarily from the enclave and it will apply only to employees under the contract. Hall declined to make such a wage determination; appellants argue that his reasons for doing so were improper.

■ Hall's recital of the reasons for his decision reveals two distinct and independent bases for his reluctance to make an enclave determination. The first once again relates to the need to allocate Labor Department staff resources. Even though Hall knew that Kentron's past wage rate data were available,[40] he felt that an accurate wage determination would require further investigation. On the basis of the information he knew was available, he would still have required *verification* that the wages listed in Kentron's records were actually paid and that they were not out of line with other wages being paid in the enclaves, if any. As will be discussed, some of his concern about verification would have been removed if the Navy had forwarded information in its possession.[41] However, on the basis of the data Hall actually had, and given the scattered location of the relevant enclaves, we must again conclude that his decision not to commit the necessary staff resources was within the bounds of· his discretion.

Hall further stated that, even if he knew precisely what Kentron had paid in the past (and, presumably, that Kentron alone occupied the relevant enclaves), he would still have refused to issue a wage determination on that basis alone. A broader sort of "verification," based on data relating to analogous labor categories in the general area, would have been required but was not available. In effect, Hall was acting under a policy, recommended by his superiors,[42] to avoid making enclave determinations under most circumstances.

■ Appellants do not deny that Hall acted under such a policy. Rather, they claim that policy conflicted with the Labor Department's own "Manual of Policies and Procedures for Administration of the Service Contract Act." Although there has been some debate over whether the Manual was actually binding on the Department, we will proceed on the assumption that it was and therefore that Hall's actions were improper if they conflicted with its commands. There was no such conflict. The Manual merely provides that the Secretary's delegate *may* elect to limit the "locality" covered by a wage determination to an isolated federal installation.[43] While it permits such an approach, the Manual does not compel it. Neither does the Service Contract Act. Hall's policy decision fitted within the discretion given to him by the Manual itself; and it simply did not violate any legal requirement.

Furthermore, there was a rational basis for application of that policy in this case. Enclave wage determinations afford the incumbent contractor an opportunity for "last minute artificial inflating of rates in anticipation of the contract renewal," thereby dampening com-

---

40. As Hall must have known, a service contractor is required, under its contract, to keep complete wage data on hand and available to the Government for three years following completion of its contract. 29 C.F.R. § 4.6(g). See Brief of IBEW at p. 29 and Hall Deposition at pp. 14, 137–38.

41. The wage data relating to Kentron's ten years at PMR were in fact fully verified·

by the Defense Contract Audit Agency before the Navy made payment thereon.

42. See Hall Deposition at p. 82. Hall had received instructions from the Administrator to "reduce where possible the existing number of . . . [enclave] determinations and not [to] proliferate them in the future." J.App. at p. 88.

43. See § 303(b) of the Manual. Kentron's Brief at p. A–79.

petition from other possible offerers.[44] Contrary to Kentron's arguments, there is little reason for the incumbent to refrain from such a tactic. On renewal, the Government, not the contractor, will bear the burden of increased costs. Given Kentron's long incumbency, and the resultant seniority of its employees, there was reason to believe that Kentron's wage rates might have, perhaps unintentionally, outstripped those prevailing in the general area.[45] Certainly that possibility was sufficient to support Hall's demand for verification by area wage data. As far as he knew, no such data were available; nor did he have the resources to generate such information. Once again, we find a rational basis for Hall's decision.

### B. *The Navy's Error*

■ Appellants complain that the Navy failed to forward critical wage data to the Labor Department with the Standard Form 98 or at any later time. To the extent that this information was "readily available" to the Navy, such inaction clearly violated the Service Contract Act and the Armed Services Procurement Regulations.[46] If a Navy error of this sort was causally related to the Labor Department's refusal to issue a wage determination, then the procurement procedure for this service contract was fatally flawed.

There were two sets of data which should have been, but were not, forwarded by the Navy. When the Standard Form 98 was submitted, on 5 August 1970, the Navy knew of and could have

sent along Kentron's records of actual wages paid during its prior performance of the contract. After the best and final offers had been submitted, the Navy received from Kentron, and could have forwarded, wage data relating to similar labor categories at nearby NASA ranges on Kokee and Kauai.[47]

While the Navy apparently simply ignored its ministerial duty to transmit these collections of information, further inquiry is necessary regarding the possible impact of such error on the Labor Department's decision. It appears from the very nature of Hall's reasons for refusing to make a wage determination that, even if the Navy had punctually complied with its transmittal duty, the information at issue could not have affected the Labor Department's decision.

As IBEW admits, Hall knew that Kentron's past wage data were available. If it had been forwarded, he would have learned that it was satisfactorily "verified" as to the amounts actually paid. However, that revelation would have left unfulfilled his further reasonable demand for verification based on similar rates prevailing in the general area.

Kentron strenuously urges that such area rate verification would have been available if the Navy had forwarded its "white paper" on comparable wages at Kokee and Kauai. This argument conveniently overlooks the fact that the "white paper" was not in the Navy's hands, and thus not "readily available" for forwarding,[48] until *after* the best and final offers were in. That was just too late. The Armed Services Procure-

---

44. J.App. at p. 207.

45. J.App. at p. 105.

46. The District Court found the Navy's failure to forward all readily available wage data to be "without adequate justification." J.App. at p. 214. Since the required action was purely ministerial in nature, there can be no question of discretion to modify or ignore this duty.

47. J.App. at pp. 53–54, 64–66. From the nature of the wage scale data in this "white paper," it appears that it must

have been sent to the Navy some time after 1 May 1971.

48. It cannot be persuasively argued that the Kokee and Kauai information, or other comparable data, was "readily available" to the Navy before it was delivered by Kentron. The Navy does not have the capability of launching investigations into prevailing wage rates. The Navy has a narrow statutory duty to serve as a conduit, not a broad mandate to become an extended branch of the Wage and Hour Division of the Department of Labor.

ment Regulations [49] provide that the Labor Department's response to a Standard Form 98 (*i. e.*, a wage determination) "shall not be effective" if received later than 10 days before the date established for initial receipt of proposals, unless there is a reasonable time to notify the offerers thereof. *A fortiori,* a wage determination received after best and final offers have been submitted would not have been effective. In the face of imminent expiration of the prior service contract, and the need for a four-month phase-in period, renegotiation on the basis of a belated wage determination would obviously have been impractical at that time. Therefore, forwarding of the new Kokee and Kauai data would have been, at best, a futile gesture. Failure to do so was, in that sense, harmless error.

■ We conclude that the Navy's neglect of its duty to forward information could not have been causally related to Mr. Hall's refusal to issue a wage determination. Our decision is made with full awareness that Mr. Hall acknowledged that he *would have* made such a determination *if* there had been sufficient data.[50] In response to hypothetical questions, he merely stated the obvious: if he had had sufficient information, he would not have based his decision in any part on the problem of committing the resources required to compile more. We do not doubt his related statement that an incoming Form 98 which had full and adequate information attached would have stood out as exceptional. However, our analysis of the possible reasons for his decision makes it clear that no wage determination would have issued even if the Navy had performed its duty with alacrity and good will. At best, a timely Form 98 might have arrived with Kentron's wage data, but not with the sort of additional "analogous data" which we have discussed above and which Hall said would have distinguished one Form 98 from the majority of others.

In effect, Hall was asked if he would have made the wage determination if he had had data type A *and* data type B. He said yes. But Hall never had type B, and the Navy never had type B until after the bid date had passed, so the Navy's failure to forward type B data had no causal connection with Hall's decision-making.

■ Appellants claim that, once any Navy error was shown, the Government should have borne the burden of showing that the Labor Department's decision complained of would not have been affected. To the contrary, even if such a burden might eventually have shifted to the Government, it would not have done so until the appellants had shown that Hall's decision *could* have been influenced by the unforwarded data. One complaining of procedural irregularity in the procurement process must first show that the alleged error *at least potentially* affected the substantive result.[51] Appellants have not met their burden in this respect.

49. 32 C.F.R. § 12.1005–3 (a) (1) (1972).

50. In what he later referred to as "my hypothetical," counsel for plaintiff Kentron asked Mr. Hall the following question:

If there had been attached to that Form 98 data relating to the past 10 years of wages paid by the incumbent contractor *and* analogous data relating to what the incumbent contractor or other employers paid in similar locales for similar jobs . . . would that have distinguished the Form 98 from the overwhelming majority of the others that you received? [Emphasis added.]

Mr. Hall answered, "Yes, it would have." To defense counsel's subsequent question whether, in that event, Mr. Hall "would . . . have made a wage determination," he answered, "If there was sufficient wage data." See Hall deposition at pp. 194–95.

51. Absent a showing here of some specific *possible* impact of the information which was not forwarded, the Government would be faced with the impossible task of proving the negative when what was to be negatived could itself not be ascertained.

## IV. *Conclusion*

The award of the PMR service contract followed a lengthy and complicated procurement process. It is certainly true that not every judgment made along the way was a model of prescience. But, stripped to their basic allegations and measured against undisputed facts, appellants' claims would require this court to substitute its own decisions in place of those made by the government officers to whom primary discretion has been committed. And the relief sought would gravely interfere with the ongoing conduct of the Government's business. While the contracting officer and the Labor Department had both expertise and limited discretion to make policy, this court brings to a review of their action little more than the fortuitous and ambiguous lessons of hindsight. We can of course insist that procedural fairness and the bounds of discretion be respected. They were. Accordingly, the District Court's grant of summary judgment in favor of appellees is

Affirmed.

FAHY, Senior Circuit Judge, dissenting:

I do not think the case as presented to the District Court was susceptible of disposition by summary judgment. I accordingly must dissent from affirmance of the grant of such judgment for the Secretary of the Navy, appellee. The record does not establish that the bidders for the contract and the prospective employees thereunder were not entitled to the benefit of a wage determination by the Department of Labor. For an exemption from the requirement of a wage determination to be valid it must be established by "strong and affirmative evidence" that such exemption was "necessary and proper" to protect the public interest or to avoid serious impairment of Government business.[1]

1. 33 Fed.Reg. § 4.123(b), at 9890 (1968), as amended, 29 C.F.R. § 4.123(b)(1) (1972), which provided:

(b) *Administrative action under section 4(b) of the Act.* The authority conferred on the Secretary by section 4(b) of the Act will be exercised with due regard to the remedial purpose of the statute to protect prevailing labor standards and to avoid the undercutting of such standards which could result from the award of Government work to contractors who will not observe such standards, and whose saving in labor cost therefrom enables them to offer a lower price to the Government than can be offered by the fair employers who maintain the prevailing standards. Administrative action consistent with this statutory purpose may be taken under section 4(b) with or without a request therefor, when found necessary and proper in accordance with the statutory standards. No formal procedures have been prescribed for requesting such action. However, a request for exemption from the Act's provisions will be granted only upon a strong and affirmative showing that it is necessary and proper in the public interest or to avoid serious impairment of Government business. If the request for administrative action under section 4(b) is not made by the headquarters office of the contract-

ing agency to which the contract services are to be provided, the views of such office on the matter should be obtained and submitted with the request or the contracting officer may forward such a request through channels to the agency headquarters for submission with the latter's views to the Administrator of the Wage and Hour and Public Contracts Divisions, Department of Labor.

All exemptions must be justified as "necessary and proper" whether or not a request for an exemption is made. The requirement that a request for an exemption make a "strong and affirmative showing" that the exemption is "necessary and proper" merely informs the party requesting the exemption of the degree of justification required by the Act. The same degree of justification is also demanded of the Labor Department when it exempts a contract though an exemption was not requested since there seems to be no reason consistent with the Act that would require a higher degree of justification when a request is made. The fact is that because of labor negotiations the Navy indicated that it did not want a wage determination to be made. Hall Deposition at 144–145 and Tyburski Memorandum of Sept. 8, 1970, regarding telephone conversation of Sept. 4, 1970, with the Navy Contract Officer. Although this conversation took place the day after

Moreover, the reasons for the exemption are required to be consistent with the remedial purpose of the Service Contract Act, 41 U.S.C. §§ 351–357 (1970), as amended, 41 U.S.C.A. §§ 351–358 (Supp. 1973).[2]

The District Court found, and it is not disputed, that the Navy without adequate justification "failed to comply with the unambiguous language of the pertinent regulations[3] and SF–98 [Notice of Intention to Make a Service Contract] imposing a mandatory duty to furnish all readily available wage data. The relevance and probative value of such information is to be determined by the Department of Labor, not the contracting agency." Nevertheless, the court granted summary judgment for the Navy because the court found solely on the basis of the Hall affidavit and deposition that "the evidence is insufficient to conclude that had the Navy supplied the information required and readily available to it the decision of the Department of Labor not to make a wage determination would have been otherwise." This, I think erroneously, placed the burden upon the unsuccessful bidder to establish, or else suffer summary judgment against it, that had the Navy complied with its duty in the matter, the Labor Department would have made the wage determination. The burden surely was upon the Navy to establish, in a manner free of any material issue of fact, that the determination would not have been made.[4] If, as the court found, "the evidence is insufficient" to enable the District Court to conclude a wage determination would have been made, the Navy was not entitled to summary judgment.

Furthermore, the *post factum* reasons advanced for the finding that no wage determination would have been made had Navy complied with its obligations are not supported by the record.

The Hall submission by affidavit and deposition clearly indicates that the primary reason that any enclave wage determination was not made was that the Administrator of the Wage and Hour and Public Contracts Division of the Labor Department had prohibited such determinations, as a matter of policy. The Administrator wanted to prevent incumbent contractors from artificially raising wages at the end of their contracts. The fear of such action is not as a matter of law on this record strong and affirmative proof that an exemption for all enclaves as a class is necessary and proper for the protection of the public interest. The effect of the policy is to deny indiscriminately the protections afforded by the Act to a great number of service employees, contrary to the remedial purposes of the Act. Less extreme measures may well avoid the danger feared. Moreover, there is no indication that wages had been raised by the incumbent contractor in this case.

In any event, Mr. Hall's evidence is that he never determined whether the facilities here involved qualified as enclaves, and he conceded that had the pol-

---

Mr. Hall said he decided not to make a wage determination, the memorandum suggests that the Labor Department was willing to make a wage determination if the Navy so desired.

2. *Ibid.*

3. The Navy's submission of SF–98 was untimely, without the required explanation as well as without the necessary wage information. 33 Fed.Reg. § 4.4(a) & (b) at 9882 (1968), as amended, 29 C.F.R. § 4.4(a) & (b) (1972) and 34 Fed.Reg. § 12.1005–2(a) & (b), at 17902 (1969), as amended, 32 C.F.R. § 12.1005–2(a) & (b) (1972).

4. Since the regulations required the exemption to be justified, as being "necessary and proper in the public interest or to avoid serious impairment of Government business" "with due regard to the remedial purpose of the statute," 33 Fed. Reg. § 4.123(b) at 9890 (1968), the burden was on the Navy to present the reasons for the exemption. If the reasons presented are found to be either invalid or insufficient, then the Navy may have the additional burden to prove that the error was harmless, notwithstanding the invalidity or insufficiency of the justification for the exemption.

icy been otherwise, respecting enclaves, and had the Navy submitted the required information, he could not say whether or not sufficient resources for verification would have been available. It is therefore clearly conjectural now to postulate as a reason to support the decision not to make an enclave determination the Division's lack of resources to verify the wage data of Kentron. Such conjecture is not adequate justification to support the exemption as being necessary and proper to protect the public interest or avoid serious impairment of government business.

Lack of Division resources is postulated as the basis also for not making an area or partial wage determination. There is serious doubt that such a reason not to make a wage determination qualifies under any statutory standard consistently with the remedial purposes of the Act. Moreover, the Division was not dependent upon its personnel alone for the compilation of data.[5] Mr. Hall's judgment that he lacked resources to make such a determination was made in ignorance of information necessary for an informed decision. He did not know what information the Navy had which should have been submitted; he did not know how many of the job classifications listed by the Navy represented service employment, because the Navy's descriptions were not adequate; he did not know that Kentron had been the incumbent contractor since 1961, or that in its previous contracts there was a schedule of wages, although he did know generally that wage data was available, but not specifically what the Navy had available; hence he was unaware of the need for a wage determination to protect service employees with seniority.[6] His decision was made, moreover, under a possibly mistaken assumption that he had far less time available than the regulations allowed.[7] He admitted that he could not say whether or not he would have been able to make a wage determination had additional time been available.[8]

The Hall affidavit and deposition, considered with the failure of the Navy to comply with its mandatory obligations, and the pure speculation that had it done so a wage determination by Labor could not or would not have been made, presents a record free of that "strong and affirmative evidence" that the exemption of a wage determination, a determination of great importance to employees as well as bidders, was "necessary and proper" to protect the public interest or to avoid serious impairment of Government business. This is aside from the grant of summary judgment for Navy upon an erroneous view of where lay the burden of establishing that the determination would not have been made had the Navy complied with its obligation.

I respectfully dissent from affirmance of the grant by the District Court of summary judgment for appellees.

---

5. 29 C.F.R. § 1.3 (1972) and 33 Fed.Reg. § 4.164, at 9895–9896 (1968), *as amended,* 29 C.F.R. § 4.164 (1972).

6. Mr. Hall also may not have known that the contract was for five years since no indication of the duration of the contract was given by the Navy in its submission of SF–98 and appended information.

7. The Hall deposition at 73, 86–89. Appellant suggests that a wage determination could have been made anytime prior to 10 days before the awarding of the contract. 33 Fed.Reg. § 4.5(b) at 9883 (1969), *as amended,* 29 C.F.R. § 4.5(b) (1972). I refrain from deciding whether this reading of the regulation is correct. If it is correct, then Mr. Hall's reasons are clearly insufficient.

8. Hall Deposition at 89. The Tyburski Memorandum, note 1, *supra,* suggests that the Labor Department was willing and able to make a wage determination. Also, Mr. Hall in his affidavit states that he could have made a partial wage determination, but it was a question of resources.