**MIL–COM ELECTRONICS CORPORATION, Plaintiff,**

v.

**Edward C. ALDRIDGE, Jr., Secretary of the Air Force, et al., Defendants.**

Civ. A. No. 89–0095.

United States District Court, District of Columbia.

May 5, 1989.

Robert A. Klimek, Washington, D.C., for plaintiff.

Sharon A. Cohen, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

REVERCOMB, District Judge.

This case, which was argued originally as a motion for a preliminary injunction, is now before the Court on cross-motions for summary judgment. Plaintiff Mil–Com Electronics Corporation ("Mil–Com"), a manufacturer of electronic equipment, seeks cancellation of an undefinitized contract award ("UCA") made to Northrop Electronics Corporation ("Northrop") for the procurement of Turbine Engine Monitoring Systems ("TEMS") shipsets. Plaintiff claims that the Air Force acted arbitrarily, capriciously, and contrary to law in awarding the contract to Northrop, and that it abused its discretion by issuing an undefinitized award.

### 1. Factual Background

This lawsuit grows out of the Air Force's determination that it needed TEMS units for the KC–135 aircraft. The TEMS unit monitors engine performance, tracks engine warranty data, and assists in the analysis of engine malfunctions. On August 8, 1988, the San Antonio Logistics Center issued a Request for Proposals ("RFP"), soliciting delivery of 47 TEMS shipsets with an option for 17 to follow. The RFP specified delivery of 4 units per month beginning in December, 1989, continuing through November, 1990.

One aspect of the procurement in particular is important to the understanding of this case: the normal competitive apparatus of procurement was limited due to scheduling exigencies connected with the modification of the KC–135 under a separate, pre-existing contract with Boeing Aircraft. Delays in the installation of the TEMS shipsets in the KC–135 might result in forced groundings of the planes, which are used to support the defendant's bomber and fighter aircraft.

The RFP listed Northrop as the only identified source capable of providing the TEMS for the KC–135, and advised other potential offerors that "offers from firms not previously identified as sources for this

requirement will only be considered when it can be determined prior to award that the material or service being offered will meet the Air Force's requirement...." (§ M–25).

Mil–Com is a qualified supplier of TEMS for the A–10 aircraft, but was not qualified to supply TEMS for the KC–135 at the time the RFP was issued. In an attempt to become qualified, Mil–Com began the approval process on May 25, 1988, submitting a test unit to the Air Force. The plaintiff's TEMS unit was tested for use on the KC–135 in August, 1988. The results of the testing were negative.

In October, after defendant had issued the RFP (with its extra-normal qualification procedure), Mil–Com produced further technical data to the Air Force; after review of these submissions, the Air Force decided that plaintiff's product could be used on the KC–135, but only upon the successful completion of "first article submission testing" before or during the initial stage of production. However, the RFP at issue in this case did not provide for first article submission testing, and therefore, defendant determined that plaintiff did not qualify for award under the RFP. Thereafter, on November 10, defendant awarded an undefinitized contract action ("UCA") to Northrop for delivery of the TEMS units.

Plaintiff argues that the sole-source award to Northrop was in contravention of various statutes and regulations. It alleges that the contracting officer's decision with respect to plaintiff's qualification was an illegal ex post facto alteration of the terms of the RFP, since Section M–25 of the RFP limited evaluation to the technical data submitted by plaintiff in support of its offer.

## 2. Standard of Review

■ Judicial review of procurement actions under the Administrative Procedure Act is based on the administrative record; the ultimate award of a contract is left to agency discretion, and the courts should exercise restraint in reviewing such decisions. The D.C. Circuit has held that procurements should be left undisturbed unless the Court can find no rational basis for the agency's decision. *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C.Cir.1971). Furthermore, plaintiffs seeking to have procurement contracts set aside must show, in addition to a lack of rational basis, a clear and prejudicial violation of applicable statutes or regulations. *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973).

## 3. Discussion

Plaintiff's case depends on two issues: (1) whether defendant followed proper procedures in awarding the UCA to Northrop, and (2) whether Mil–Com was a qualified offeror of TEMS for the KC–135. As mentioned above, the normal method for testing qualification in procurement matters is first article testing, but the RFP in this case bypassed that stage due to the urgency of the requirement. Penny Andersson Decl. ¶ 17. Instead, the RFP substituted its own procedure for determining qualification, set forth in the RFP.

Plaintiff argues that it submitted technical data in support of its request to be qualified, but that defendant abandoned the RFP and illegally awarded the UCA to Northrop. The first set of plaintiff's arguments with which the Court will deal concerns the propriety of the UCA award, and the manner in which the UCA was processed once the decision had been made to make the procurement using a UCA. Then the Court will turn to a discussion of the merits of plaintiff's arguments respecting qualification.

■ Plaintiff's first argument is based on 10 U.S.C. § 2326, which governs undefinitized contract actions, and permits their use only where

the request for authorization of the contractual action includes a description of the anticipated effect on requirements of the military department concerned if a delay is incurred for purposes of determining contractual terms, specification, and price before performance is begun under the contractual action.

Plaintiff argues that the Air Force failed to comply with this statute, but defendant points out that the UCA in this case states that "failure to meet the delivery schedule will result in work stoppage at Boeing by January 1990," and that this will result in an installation charge of $1,100 per shipset and possible stopping of the production line at a cost of $38,004 per day. This statement complies with § 2326, insofar as it describes the "anticipated effect" of delays on the Air Force.

■ Plaintiff also argues that the UCA violated 48 C.F.R. § 217.75, which sets forth the Defense Department regulations governing UCAs. The regulation provides that UCAs may be issued only when

(1) the negotiation of a definitive contract action is not possible in sufficient time to meet the government's requirements; and (2) the government's interests demand that the contractor be given a binding commitment so that contract performance can begin immediately.

Defendant has shown that the UCA met these criteria, since the contracting officer's statements show that a definitized contract could not be completed in time to meet the required delivery schedule to avoid the costly delays mentioned above. On this basis, the government argues that it was in the Air Force's interest to give Northrop the required "binding commitment" to begin contract performance in time to meet that delivery schedule. The Court will not second-guess the Air Force on this question, and finds that the pre-existing Boeing contract provided a rational basis for concluding that a "binding commitment" needed to be made as soon as possible.

■ Plaintiff makes several additional arguments about alleged improprieties in the UCA award, which amount to a claim that it was inappropriate to award a UCA while the RFP was outstanding and its requirements were still in effect. Plaintiff argues that the urgency of the procurement was not as great as defendants allege, in an effort to insinuate that a "sweetheart deal" existed between the Air Force and Northrop. The most important piece of evidence plaintiff adduces in favor of this argument is that the Air Force agreed to let Northrop use two component parts of the TEMS units which existed in large numbers in order to meet the production deadline of the procurement. The Court is satisfied that this evidence does not show that the Air Force had such an abundant supply of these parts that no "emergency" existed with respect to this procurement, since it seems to be the case that Air Force bases are customarily supplied with a stock of these spare parts, and the Air Force simply allowed Northrop to use them in order to meet the contract deadline. The fact that the Air Force was willing to allow its usual quantity of spare parts to be used to meet that deadline persuades the Court that the Air Force did, indeed, approach this procurement as an urgent one, since it allowed Northrop to use pre-existing parts rather than slow down the project.

In addition, plaintiff argues that the authorization to issue the UCA violated the regulation limiting issuance of UCAs, AF FAR SUPP Section 17.9004, on the basis that the contracting officer failed to include a narrative statement of the effects which would have been felt due to delays if the normal RFP procedure had been followed. The Court finds that the UCA contained such a narrative based on the impact delay would have on the separate, pre-existing contract with Boeing, including a recitation of the exact costs per day of delay.

Plaintiff also argues that the chain of command for UCAs was violated because there was no coordination with the Director of Material Management. This argument is incorrect, since § 17.9004 merely provides that the "statement shall be signed at a level no lower than the director (or deputy) of material management within the Air Logistics Center." In this case, the justification for the UCA was signed by the Vice Commander of the Logistics Center, a higher-level official than the Director of Material Management. The Court finds that the AFLC Form 224 justification for the UCA was prepared in accordance with regulations.

The only remaining questions about the legitimacy of the UCA are plaintiff's challenges to the procedures used to issue the contract once the decision had been made to proceed with a UCA.

■ Plaintiff challenges the propriety of making the sole-source award to Northrop while the RFP was outstanding. However, plaintiff has failed to show that a UCA cannot be authorized for a sole-source procurement once an RFP has been issued. To the contrary, the issuance of a UCA to a sole qualified offeror under an RFP has been upheld by the Comptroller General. *Hy-Gain Electronics Corporation Antenna Products Co.*, B-180740, 74-2 CPD ¶ 20.

The plaintiff's remaining argument with respect to the UCA is that the terms of the contract *were* spelled out in Northrop's offer, thus contravening the requirements of § 2326 because of *too much* detail, but Andersson's affidavit shows that the final specifications were not necessarily the same as those contained in the offer, because defendant was required to perform additional reporting, auditing and negotiating prior to finalizing the terms of the contract. The Andersson Declaration explains why the award to Northrop was made as a UCA. Although the Northrop bid contained specifications and pricing information, defendant is required to make field reports, conduct audits and negotiations. Andersson Decl. ¶ 24. This process was expected to take several months, i.e., at least five months would elapse before contract conditions would be finalized, while performance under the contract had to be underway well before that time. This is a rational basis for awarding a UCA rather than proceeding under the RFP.

■ Plaintiff's remaining arguments concern its qualifications, and the relationship between the field testing it was undergoing and the contracting officer's decision that Northrop was the only qualified offeror for this procurement. Plaintiff argues that it was an abuse of discretion for defendant to issue a UCA to Northrop on the grounds that plaintiff was not qualified by field testing. Plaintiff argues that the contracting officer's decision should not have been based on the results of the separate testing Mil-Com was undergoing in the course of first article submission testing, and that the evaluation of its TEMS equipment should have been restricted to the information required in the RFP alone. The contracting officer concluded that Mil-Com was not qualified, but this finding, which is committed to the officer's discretion by the RFP, was based not only on the flight testing results, but also on the additional information plaintiff submitted. The finding was made on the basis of all information regarding Mil-Com. Andersson Decl. ¶¶ 22, 23, 31.

The Andersson Declaration states that "[d]ue to the unusual and compelling urgency of this requirement, I determined that competition would be limited to sources not requiring first article testing ... Although not an approved source at the time, [Mil-Com] was solicited since I understood that Mil-Com was in the source approval process. I was aware that Mil-Com would perform ground/flight compatibility testing in August, 1988." Subsequently, Mil-Com stated that it had passed flight testing as support for its solicitation under § M-25. In response to the requirements of the RFP, plaintiff submitted evidence this its TEMS would meet Air Force requirements, including a statement that "two shipsets that were produced by Mil-Com ... successfully passed acceptance testing and flight testing conducted by the U.S. Air Force." Andersson found that this was incorrect. (Andersson Decl. ¶ 19). Although it appears from the record that the contracting officer based her finding that plaintiff was unqualified in part on the basis of data generated during first article testing, § M-25 provides that the decision of the contracting officer regarding the adequacy of the data shall be final. Mil-Com argues that the contracting officer cannot look beyond the submissions made under the RFP to determine qualification. However, the fact that Mil-Com represented that it had passed flight testing as part of its own submission under the RFP makes the results of the flight test fair

game for evaluation. The flight testing results were introduced into defendant's calculations by Mil–Com's own reliance on them. The fact that Mil–Com had problems during flight testing is undisputed, and could easily form part of a rational basis for finding its RFP submissions insufficient.

Since the contracting officer determined that plaintiff was not qualified, and that the plaintiff's TEMS could be used for the KC–135 only after successful completion of first article testing, there was only one remaining offeror which was qualified: Northrop. Although Northrop was not the lowest bidder, it was the only qualified bidder. The RFP was set up for evaluation based on either pre-existing qualification or technical submissions. Since Mil–Com was found to have submitted insufficient data, and the Air Force had determined that it would qualify Mil–Com only upon the basis of successful first article testing, Northrop was the only remaining offeror for this procurement.

 Finally, under *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166 (D.C.Cir. 1973), procurement decisions are to be set aside only if they are clearly prejudicial. In this case, plaintiff was found to be not qualified by the contracting officer to whom final authority was granted, under the terms of the RFP, to determine that issue. Since there was only one qualified offeror, the possibility of prejudice to plaintiff in by-passing the RFP in favor of the UCA was minimal. Regardless of the method used, the contract would have gone to Northrop, since it had been determined already that Mil–Com would only be eligible once it had successfully completed first article testing; such testing was not provided for under the RFP. The same considerations apply to any irregularities in the actual processing of the UCA: since plaintiff was not qualified, violations of Air Force regulations, if any did occur, had no prejudicial impact on Mil–Com.

4. Conclusion

For the foregoing reasons, the Court finds that the defendant's decision to award the TEMS contract to Northrop by means of an undefinitized contract action was not prejudicial, was neither arbitrary nor capricious, was not an abuse of discretion, and had a rational basis. Therefore, it is hereby ORDERED that plaintiff's motion for injunctive relief, and its cross-motion for summary judgment, are DENIED. It is FURTHER ORDERED that defendant's motion for summary judgment is GRANTED.

SO ORDERED.