Senator Howard M. METZENBAUM et al., Plaintiffs,

and

Cessna Aircraft Company, Plaintiff-Intervenor,

v.

Harold BROWN et al., Defendants,

and

Beech Aircraft Corporation, Defendant-Intervenor.

Civ. A. No. 78–188.

United States District Court, District of Columbia.

March 14, 1978.

Felice D. Cohen, Washington, D. C., for plaintiffs; Howard M. Metzenbaum, Cleveland, Ohio, Nathan R. Zahm, Sepulveda, Cal., of counsel.

Philip D. Bostwick, Washington, D. C., for Cessna.

Earl J. Silbert, U. S. Atty., Karen I. Ward, Asst. U. S. Atty., Washington, D. C., for defendants.

Jerome Ackerman, Washington, D. C., for Beech.

### MEMORANDUM

OBERDORFER, District Judge.

Senators Howard M. Metzenbaum and Barry M. Goldwater have filed this suit to enjoin Secretary of Defense Harold Brown and Secretary of the Navy Graham Claytor from purchasing 22 turboprop light utility transport airplanes (CTX aircraft) for the Navy without advertising for competitive bids. The Senators claim the purchase would violate their constitutional right to vote as Senators for the Department of Defense Appropriation Authorization Act, 1978 (1978 Appropriation) which authorized funds for the CTX aircraft purchase.[1]

The 1978 Appropriation provided that: Funds are hereby authorized to be appropriated during the fiscal year 1978 for the use of the Armed Forces of the United States for the procurement of aircraft . . . as authorized by law, in amounts as follows:

\* \* \* \* \* \*

---

1. Pub.L.No.95–79, 91 Stat. 323 (1977).

For aircraft: . . . for the Navy and the Marine Corps, $3,499,800,000 . . ..

At the time the 1978 Appropriation was under consideration (and since), the determination as to whether the Secretaries should procure Navy property by formal advertising or by other methods was governed by a statute codified in 1956. 10 U.S.C. § 2301 (1970), *et seq.*[2] Section 2304(a) of Title 10 provides that:

Purchases of and contracts for property or services covered by this chapter shall be made by formal advertising in all cases in which the use of such method is feasible and practicable under the existing conditions and circumstances.

In the course of enacting the 1978 Appropriation, the Armed Services Committee of the Senate (of which Senator Goldwater was a member) recommended authorization of $21.6 million to enable the Navy to purchase the 22 CTX aircraft. The committee recommended procurement of an "off the shelf" aircraft (*i. e.,* already in production) which is "common with the Army/Air Force light utility transport."[3] A House/Senate Conference Committee thereafter filed a report designed to resolve differences between the two Houses about the 1978 Appropriation. That report stated that the House had deleted the Navy request for the 22 CTX aircraft because the Navy "had not even begun source selection and had not completed detailed specifications of the aircraft it intends to purchase." After discussion, the conferees agreed, however, "to provide funds for an off-the-shelf turboprop, light utility transport aircraft" in the amount of $21.6 million originally authorized by the Senate bill.[4]

When the Conference Report was submitted to the full Senate for approval, four Senators, including the two plaintiffs here, engaged in a colloquy about the meaning of the Conference Committee Report with respect to Navy procurement of the CTX aircraft. In the colloquy, Senator Metzenbaum, who was not a member of the Conference Committee, asked Senator John Stennis, a member of that committee (and Chairman of the Senate Armed Services Committee), if the Conference Committee had intended to recommend that the CTX aircraft be procured by competitive bidding. Senator Stennis replied affirmatively. Senators Goldwater and Towers concurred with Senator Stennis.[5]

After the colloquy, the 1978 Appropriation was passed by Congress, signed by the President, and became effective on July 30, 1977. It contained no reference, specific or

2. Section 2304(a) lists 17 exceptions to the general requirement of formal advertising such as subsection (a)(13) which authorizes dispensing with such advertising for the procurement of technical equipment whose standardization and the interchangeability of whose parts are necessary in the public interest.

3. S.Rep.No.95–129, 95th Cong., 1st Sess. 28 (1977). The House Appropriations Committee similarly recommended that the Navy "buy the aircraft that is common to the Army and Air Force." H.R.Rep.No.95–451, 95th Cong., 1st Sess. 241–42 (1977). A subsequent report by the Senate Appropriation Committee recommended the procurement of a "commercial, off-the-shelf FAA certified" product for CTX utility aircraft without reference to the procurement's being common with the Army and Air Force utility aircraft. S.Rep.No.95–325, 95th Cong., 1st Sess. 211 (1977).

4. S.Rep.No.95–282, 95th Cong., 1st Sess. 21 (1977). Neither the Conference Committee Report nor any of the other Committee Reports referred to the question of whether the 22 CTX aircraft would be procured by formal advertising or by some other method. None of the reports referred to the 1956 law or suggested modification of special application of that law to the 1978 Appropriation.

5. Senator Metzenbaum asked Senator Stennis: "[I]f it was the intent of the Conference Report that the CTX be competitively procured?" Senator Stennis replied, "Yes. The Senator is certainly correct." Senator Goldwater added "I think that we have made it perfectly clear on the floor that this is to be competitive bidding." Later in the colloquy, Senator Stennis stated: "There is no doubt that it is an open bid for any manufacturer who can meet these requirements." Senator Towers, another member of the Conference Committee, then joined the colloquy with the statement: "My understanding certainly is consistent with that of the distinguished chairman, that this is to be competitive. I was part of the deliberation on this. That was the intention." 123 Cong.Rec. S11875–76 (daily ed. July 14, 1977).

otherwise, to the method by which the CTX aircraft should be procured and made no change in the 1956 law.

Thereafter, the Department of the Navy issued to the Department of the Army an interdepartmental purchase request for the procurement of the CTX aircraft from the Beech Aircraft Corporation (Beech), the common source already supplying the CTX aircraft to the Army and Air Force. This request, dated December 15, 1977, was issued without any advertisement for competitive bids from other actual or potential manufacturers of such aircraft.

Meanwhile, on September 30, 1977, Senators Metzenbaum and Goldwater wrote Secretary Claytor about the Senators' colloquy on the Senate floor and their concern that the procurement of the planes be consistent with it. Secretary Claytor replied on October 31, 1977, that the Department of Navy had thoroughly reviewed the legislative history of the 1978 Appropriation, including the Senators' colloquy and had found that it was in the "best interest of the Navy to acquire . . . the aircraft that is common with the Air Force and Army." On December 6, 1977, Senator Metzenbaum wrote Secretary Brown regarding the colloquy and the Senator's concern for competitive procurement. Secretary Brown replied on January 12, 1978, that procurement of an aircraft common with the Army and Air Force is "a reasonably business approach." [6] Finally, both Senators wrote jointly to Secretary Brown reiterating their concern and noting the possibility that they might file a suit to enjoin the procurement from the common source, Beech Aircraft Corporation.

The Senators' complaint, filed February 2, 1978, alleges that the 1978 Appropriation was intended to determine that Navy procurement of the CTX aircraft by competitive bidding would be feasible and practicable within the meaning of the 1956 law, and that the Secretaries were illegally procuring the aircraft by a non-competitive method. The complaint asked the Court for a declaratory judgment to this effect together with temporary and permanent injunctive relief.

At a hearing on the Senators' application for a restraining order, counsel for defendants questioned the standing of the Senators to bring this suit and requested the Court either to dismiss their complaint immediately or to defer any injunctive relief until the standing question could be fully briefed and argued in the context of a motion to dismiss. On the assurance of counsel that the defendants would not change the *status quo* until such a motion could be considered, the Court deferred action on the applications for preliminary and temporary relief.

In the interim, Beech and Cessna Aircraft Corporation (Cessna), the latter a prospective bidder for the CTX aircraft procurement, both moved for leave to intervene. The Court granted the motions of both potential intervenors for the limited purpose of permitting them to address the jurisdiction of the Court in the action initiated by the Senators. Thereafter, Cessna brought a separate action to invalidate the Navy-Beech contract. *Cessna Aircraft Co. v. Brown*, C.A. No. 78–293 (D.D.C., filed Feb. 21, 1978). Pursuant to Local Rule 3–4 that case has been assigned to this Court.

The Motion to Dismiss challenging the Senators' standing to sue here has now been fully briefed and argued. The Court is persuaded that the Senators do not have standing to sue with respect to this Navy aircraft procurement. The Motion to Dismiss is well taken and it will be granted, and the Motions to Intervene will be denied as moot.[7]

 In order to invoke the Court's power to enjoin action by the Executive Branch, any plaintiff must allege an "injury in fact" sufficient to create a case or controversy within the meaning of Article III of the Constitution. *E. g., Association of*

---

6. Secretary Brown sent an identical reply to Senator Goldwater on December 29, 1977.

7. In the separate action originated by Cessna, the Court will soon hold a status conference with a view to its expedited consideration.

*Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The Court's power to enjoin an Executive Branch procurement contract is particularly circumscribed. *E. g., M. Steinthal & Co. v. Seamans,* 147 U.S. App.D.C. 221, 455 F.2d 1289 (1971).

These principles apply to actions brought by Senators and Congressmen to enjoin Executive Branch action. *Compare Kennedy v. Sampson,* 167 U.S.App.D.C. 192, 511 F.2d 430 (1974) *with Harrington v. Bush,* 180 U.S.App.D.C. 45, 553 F.2d 190 (1977). In *Kennedy,* our Court of Appeals recognized the standing of a Senator to obtain judicial protection from Executive Branch injury to his right to vote for a specific Act of Congress which was allegedly being nullified and rendered of no force and effect by the unlawful failure and refusal of the President of the United States, by a so-called "pocket veto," either to sign or to veto the Act. The *Kennedy* case concerned the division of the legislative power to make laws between Congress and the President effected by Article I, Section 7 of the Constitution. The provision, in effect, gives a majority of Congress power to enact a bill so that it will become law without approval by the President should he fail to return it to the Congress within ten days of passage— provided Congress is in session during the ten day period.

In *Kennedy,* 64 Senators and a large majority of the House of Representatives voted for a medical aid bill on the eve of Congress' Christmas recess. The President neither signed the bill nor vetoed it. He claimed thereafter that Congress had adjourned at Christmas so that in the absence of his signature the bill did not become law. Senator Kennedy filed suit contending that Congress had merely recessed at Christmas and had not adjourned so that the bill had, in fact, become law and that the President was attempting unlawfully to nullify it.

The Court of Appeals ruled that the complaint put in issue the division of legislative power between the Congress and the President effected by Article I, Section 7. Congress' share of that power, the Court ruled,

was in turn shared by the individual Senators who voted for a bill threatened with nullification by an allegedly illegal veto. The illegal nullification would, if condoned, increase the power of the President over the enactment of bills of Congress into law, would diminish the power of Congress to make laws, and, would, in turn, diminish the power of each Senator and Congressman who voted for the threatened bill. Accordingly, the Court of Appeals held that such a threat of injury to a Senator's share of Congress' legislative power to make laws was actionable by him.

Although the Senators' complaint here does not identify the particular constitutional provision which creates the right to vote for which they claim protection, the Court assumes that they rely upon Congress' power granted by Article I "to provide and maintain a Navy" and "to make all Laws . . . necessary and proper for carrying into Execution" that power. This power of Congress is exercised by making laws and by legislative oversight of the administration of those laws. No interference with either of these legislative functions has been alleged. In the absence of any allegation that the Secretaries interfered with the Senators' exercise of their share of Congress' legislative power to enact and to oversee the administration of the 1978 Appropriation, the claim of standing has no support in the *Kennedy* precedent.

■■ Thus the validity of the Senators' claim to standing comes down to a question of whether a Senator or Congressman who voted for a bill which became law has standing, as Senator or Congressman, to sue to require administration of the law in accordance with his interpretation of it. The answer to that question is governed by our Court of Appeals decision in *Harrington v. Bush,* mentioned above. There a Congressman sued to enjoin CIA use of funds made available to it by an allegedly illegal appropriation. He claimed to have standing to sue because of, among other things, his "interest in seeing that all laws for which he has voted are administered in accordance with the statutory mandate." 180 U.S.App.

D.C. at 58, 553 F.2d at 203. The Court of Appeals described this as a claim that those who make the laws are "inherently injured" by any illegality associated with them. 180 U.S.App.D.C. at 59, 553 F.2d at 204. It ruled that there was no impairment or injury in fact to the Congressman's interest in his votes already cast. 180 U.S.App.D.C. at 68, 553 F.2d at 213. The allegedly illegal use of funds did not affect the legal status of the appropriations for which the Congressman had previously voted. Even if he would have voted differently if he had known of the CIA's illegal use of the appropriation for which he voted, his constitutional right to vote to "make" laws and his "official influence" in the making of them were not injured. And, as the Court of Appeals ruled, once a bill for which a Congressman has voted becomes law, his only potentially legal interest in it arises from his status as a citizen, and not from his status as a Congressman. A Congressman's complaint about the administration of appropriations for which he voted becomes, therefore, "a 'generalized grievance about the conduct of government' which lacks the specificity to support a claim of standing." 180 U.S.App.D.C. at 69, 553 F.2d at 214.

The Senators here claim that their case is different from *Harrington* because they voted for the 1978 Appropriation after personally acting to assure procurement by competitive bidding: they engaged in a floor colloquy with two other Senators about the meaning of the then pending Conference Committee Report. They claim that the exercise of their official influence gave them a "stake" in litigation designed to compel interpretation and administration of the 1978 Appropriation in the way they and the two other Senators stated on the Senate floor that it should be interpreted and administered. The Secretaries' refusal to interpret and administer the 1978 Appropriation as requiring competitive bidding threatens, they urge, actionable injury to the Senators' official influence.

Since this matter is being considered on the pleadings, as counsel for the Senators correctly contends, the Court must assume for now that the 1978 Appropriation states, on its face, that competitive bidding for the CTX aircraft is "feasible and practicable." Therefore, the Court concludes, the fact that the Senators spoke to this effect on the Senate floor instead of causing the sense of their colloquy to be embodied in the statutory language does not increase their standing beyond that of any other Senator or Congressman who voted for the 1978 Appropriation.

As the Court reads *Harrington*, once the 1978 Appropriation became law, any constitutionally protected interest of the Senators in it entitled to judicial protection ended. They retain, of course, all the legislative prerogatives of powerful Senators, not only to communicate directly with the President and the Secretaries, but also to exercise legislative oversight over the administration of the 1978 Appropriation by (among other means) committee investigation and hearing, or by seeking intervention by the General Accounting Office to prevent unlawful expenditure of funds appropriated for this Navy procurement. But under *Harrington*, they are, for purposes of their standing to sue in court, in the same status as any other public spirited citizen concerned that the Secretaries administer the validly enacted 1978 Appropriation according to law. With respect for the Senators (and for the principle of Separation of Powers), the Court has therefore concluded that the complaint does not allege facts showing actionable injury to their constitutional right to vote to make laws for the procurement of naval aircraft or to their official influence in that process. Accordingly, an Order will accompany this Memorandum dismissing the complaint and denying the contractors leave to intervene.