**CESSNA AIRCRAFT COMPANY,**
**Plaintiff,**

v.

**Harold BROWN et al., Defendants,**

**Beech Aircraft Corporation,**
**Intervenor-Defendant.**

**Civ. A. No. 78–0293.**

United States District Court,
District of Columbia,
Civil Division.

June 9, 1978.

Phillip D. Bostwick, James B. Hamlin, Richard E. Galen, Shaw, Pittman, Potts & Trowbridge, Washington, D. C., for plaintiff.

Earl J. Silbert, U. S. Atty., Robert N. Ford, Karen I. Ward, Asst. U. S. Attys., Washington, D. C., for defendants.

Jerome Ackerman, Jeffrey H. Howard, Terry Coleman, Stephen R. Mysliwiec, Covington & Burling, Washington, D. C., Charles L. Sullivan, Sullivan, Smith, Hunt & Vickery, Clarksdale, Miss., for intervening defendant.

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

OBERDORFER, District Judge.

Cessna Aircraft Company (Cessna) has sued Harold Brown, Secretary of Defense, and Graham Claytor, Secretary of the Navy (official defendants) to have this Court declare illegal, and enjoin their further performance, of, a December 29, 1977, contract between the Department of the Navy and Beech Aircraft Corporation (Beech). The

disputed contract is for the purchase by the Navy of turboprop light utility transport airplanes (CTX aircraft) manufactured by Beech. Cessna complains because the Navy let the contract to Beech without formally advertising it or otherwise affording Cessna an opportunity to compete for the business. Beech has intervened as a defendant to protect its interest in the outstanding contract.

The action, filed February 21, 1978, is now before the Court on cross-motions for summary judgment. The Court has carefully considered the pleadings and the excellent briefs and arguments by all counsel and has examined the supporting affidavits, documentary evidence, and legislative materials. The key issues framed by these submissions are (1) Cessna's standing, (2) whether Cessna's complaint is barred by laches, and (3) whether the official defendants' failure to advertise formally or otherwise permit competition for the contract violated the Armed Services Procurement Act, 10 U.S.C. § 2301 *et seq.*, which requires such advertising or competition unless infeasible or impracticable.[1]

For reasons more fully developed in Findings and Conclusions below the Court holds that: There are no genuine issues of fact material to a decision on Cessna's standing and the merits. Cessna has standing. The defendants have not met their burden of showing Cessna's action is barred by laches. On the merits, however, Cessna has failed to persuade the Court that the official defendants acted without a rational basis or committed any "clear and prejudicial violation of applicable statutes." *See Kentron Hawaii, Ltd. v. Warner,* 156 U.S.App.D.C. 274, 277, 480 F.2d 1166, 1169 (1973). Accordingly, the Court will grant defendants' motions for summary judgment and deny plaintiff's similar motion.

*I. Findings of Fact*

The material undisputed facts are as follows:

The Department of Defense proposed budget for 1978 included a request for funds for use by the Department of the Navy to purchase 22 turboprop light utility transport airplanes. In 1977 hearings on that request before the Armed Services Committees of the House of Representatives and of the Senate, Navy representatives described the CTX aircraft as one currently sold by five manufacturers, including Cessna and Beech. The Navy representatives advised those committees that they intended to purchase the CTX by a competitive purchase procedure.

At the time of these hearings, the Departments of the Army and of the Air Force had purchased and were using as their turboprop light utility aircraft a product manufactured by Beech (Beech C–12). The Army and the Air Force had contracted for the purchase of the Beech product after an effort to permit competition by Cessna and others. *See Cessna Aircraft Company-Beech Aircraft Corporation,* 54 Comp.Gen. 97 (1974), 74–2 CPD ¶ 91.

At the 1977 hearings Congressional committee members asked Navy representatives why the Navy did not plan to buy the aircraft already in use by the Army and the Air Force. Navy representatives responded that the Navy required planes with slightly different performance features, that the advantages of purchasing planes already in use by the Army and the Air Force were not as significant as might appear because the planes were to be fully maintained by the supplier, and that the market had changed since the Army and the Air Force purchases so that open competition would serve the public interest.

---

1. 10 U.S.C. § 2304(a) provides:
 Purchases of and contracts for property or services covered by this chapter shall be made by formal advertising in all cases in which the use of such method is feasible and practicable under the existing conditions and circumstances.
 10 U.S.C. § 2304(g) provides:

 In all negotiated procurements in excess of $10,000 in which rates or prices are not fixed by law or regulation, and in which time of delivery will permit, proposals, including price, shall be solicited from the maximum number of qualified sources consistent with the nature and requirements of the supplies or services to be procured, . . . .

On April 7, 1977, the House Armed Services Committee recommended against funding the Navy's CTX program "until the Navy is further along in defining the requirement and more specifics on the type of aircraft to be purchased have been determined."[2] The House adopted the Committee recommendation and did not include funds for the Navy CTX in the version of the 1978 Authorization Act which it initially approved.

On April 27, 1977, Senator John C. Stennis, Chairman of the Senate Armed Services Committee, wrote to Secretary Claytor about the funding of the CTX program. The Senator's letter stated that his Committee "has reconsidered the entire CTX program and has voted to recommend approval of $21.6 million, specifically for procurement of a commercial, off-the-shelf, turboprop aircraft which is common with the Army and Air Force." Senator Stennis' letter continued:

> If the Committee recommendation is accepted by the Senate, the entire matter will be in conference since the House rejected all funding for the CTX program.

> In order for continued support of the program, your position on the CTX program must be clear. I am, therefore, requesting your personal written assurance that the Navy supports and will follow the program recommended for authorization by this Committee.

On June 7, 1977, Secretary Claytor responded to Senator Stennis:

> As you know, the Navy has needed a replacement for the existing administrative support aircraft for several years. The need is becoming more acute as the current aircraft are inefficient and will soon reach the end of their planned service lives. . . .

> Please be assured that the Navy plans to utilize the funds appropriated to procure the latest version of the commercial, off-the-shelf aircraft presently operated by the Army and Air Force.

Thereafter the Senate Armed Services Committee recommended authorization for the appropriation of funds for the purchase by the Navy of CTX aircraft "which is common with the Army/Air Force light utility transport."[3] The report of the House-Senate Conference Committee, however, approved $21.6 million "for an off-the-shelf, turboprop, light utility transport aircraft" without mention of whether it should be in common with the plane purchased by the Army and Air Force.[4]

When the Conference Report was submitted to the full Senate for approval, four Senators, including the two plaintiffs in the recent related action of *Metzenbaum v. Brown,* 448 F.Supp. 538 (D.D.C., 1978), engaged in a colloquy about the meaning of the Conference Committee Report with respect to the procurement of the CTX. Senator Metzenbaum, who was not a member of the Conference Committee, asked Senator Stennis, who was a member, if the Conference Committee had intended that the Navy CTX be procured by competitive bidding. Senator Stennis replied affirmatively that the CTX procurement was "wide open to be competitive" and was to be "an open bid for any manufacturer who can meet these requirements." Senators Tower and Goldwater, who were also on the Committee, concurred.[5]

The Authorization Act was passed by Congress, signed by the President, and became effective on July 30, 1977. It provides:

> Funds are hereby authorized to be appropriated during the fiscal year 1978 for the use of the Armed Forces of the United States for procurement of aircraft . . . and other weapons, as authorized by law, in amounts as follows:

2. H.R.Rep.No.95–194, 95th Cong. 1st Sess. 41 (1977).

3. S.Rep.No.95–129, 95th Cong., 1st Sess. 28 (1977).

4. S.Rep.No.95–282, 95th Cong., 1st Sess. 21 (1977).

5. 123 Cong.Rec. S11875–76 (daily ed., July 14, 1977).

Aircraft

For Aircraft: . . . for the Navy and the Marine Corps, $3,499,800,000; . . . .[6]

The 1978 Authorization Act contains no reference to the CTX purchase and contains no language purporting to amend or suspend the Armed Services Procurement Act.

The legislative action then shifted to the congressional appropriations committees. The House Appropriations Committee Report discusses the CTX program at some length and concludes:

The Committee . . . directs that the Navy buy the aircraft that is common to the Army and Air Force.[7]

The Senate Appropriations Committee Report speaks only of "off-the-shelf" aircraft, without requiring that it be in common with the plane purchased by the other branches.[8] The Department of Defense Appropriation Act, 1978, appropriating $3,479,000,000 was approved on September 21, 1977.[9]

On October 17, 1977, Cessna's chief executive officer and chairman of the board of directors, Russell W. Meyer, Jr., wrote to the Navy that Cessna had recently learned "that the paperwork is in process to justify a sole source procurement of the Beech C–12–A." Meyer requested a meeting and met with a representative of the Secretary on October 27 to discuss the CTX procurement. On October 28, 1977, he wrote to the Secretary of the Navy to express his appreciation for the meeting and to urge a competitive rather than a sole source purchase of the CTX. He stated, however, that "It is probably correct to say that either decision could be supported by an appropriate legal criteria. (sic)"

On October 31, 1977, Secretary Claytor wrote to the Chairmen of the Senate and House Appropriations Committees and the Senate and House Armed Services Committees, and to Senators Goldwater and Metzenbaum, that:

After careful evaluation of our requirements and all relevant factors including the various expressions of Congressional guidance, it is our conclusion that it is in the best interest of the Navy to acquire . . . the aircraft that is common with the Air Force and the Army.

Cessna learned of this Navy decision a few days later. On November 9, 1977, Meyer wrote to Secretary Claytor complaining about the decision to purchase the CTX aircraft without competitive bidding. Meyer sent a copy of this letter to President Carter, requesting a prompt review of Secretary Claytor's decision. On November 29, 1977, Secretary Claytor wrote to Meyer that after reviewing the relevant committee reports and the Congressional Record, it was his conclusion that "the intent of Congress was for the Navy to procure the common aircraft, specifically, the current off-the-shelf version of the C–12" and that the decision to procure the C–12 was "based entirely on the Navy's operational needs and the . . . expressions of Congressional guidance . . . ." On December 5, 1977, Meyer again wrote to Secretary Claytor, further complaining about the decision to purchase the Beech aircraft without competition. At the same time, Meyer wrote to Secretary Brown, referring to earlier communications to Secretary Brown by Senators Goldwater and Metzenbaum and Meyer's communications with Secretary Claytor, and requesting Secretary Brown's views on the non-competitive procurement.

On December 15, 1977, the Navy issued to the Army a Military Interdepartmental Purchase Request (MIPR) asking that the Army purchase 22 CTX aircraft through an option to increase the quantity of planes to be delivered contained in its August 13, 1974, contract with Beech. The MIPR requested a provision allowing the Navy to

---

6. Pub.L.No.95–79, 91 Stat. 323 (1977).

7. H.R.Rep.No.95–451, 95th Cong., 1st Sess. 242 (1977).

8. S.Rep.No.95–325, 95th Cong., 1st Sess. 211 (1977).

9. Pub.L.No.95–111, 91 Stat. 886, 894. The Conference Report on the Appropriations Act does not specifically discuss the Navy CTX program. H.R.Rep.No.95–565, 95th Cong., 1st Sess. 34–37 (1977).

amend the Army/Air Force specifications for the planes. Army Determinations and Findings, dated December 16, 1977, explain the Army's conclusion that the procurement could be negotiated without formal advertising as follows:

### FINDINGS

1. The Army proposes to procure by negotiation 22 aircraft with two 2 successive options of 22 each year for a total of 66 CTX (C–12A) Aircraft from Beech Aircraft Corporation, Wichita, Kansas for the Navy as directed by NAVAIR MIPR N00019–78–MP–87041. The estimated cost of the first 22 aircraft of the proposed procurement is $17,899,838.00.

\* \* \* \* \* \*

2. Use of formal advertising for the above procurement is impractical as Beech Aircraft Corporation is the prime manufacturer of the C–12A aircraft and the only source with the knowledge and data required to provide the required services and supplies.

### DETERMINATION

The proposed procurement is for supplies and services for which it is impractical to obtain competition by formal advertising.[10]

On December 20, 1977, the Army and Beech agreed to amend the Army's contract with Beech to provide for an option for an increased quantity which permits the Army to order 66 additional planes for the Navy. This amendment required the Army to exercise the first option for 22 planes by December 29, 1977. On December 29, 1977, the Army exercised this option and contracted to buy 22 planes from Beech.

On December 29, 1977, Secretary Brown wrote Senator Goldwater that:

> I have reviewed the matter and believe that the procurement of the C–12 aircraft on a sole source basis to achieve commonality with the utility/transport aircraft used by both the Army and Air Force is a reasonable business approach.

The C–12 provides a known capability which satisfies the Navy's statement of requirements and can be delivered earlier than other alternatives. Military testing of the C–12 has been completed. Procurement of the C–12 will allow the Navy to share the common contractor support already established for the Army and Air Force.

It is possible that there would be procurement price savings through competition that might to some degree offset some of these advantages. The Department of Defense certainly believes in the value of open competition. However, in this case, I believe that on balance the Department of Defense will benefit from the procurement of a common aircraft.

On December 30, 1977, Meyer again wrote Secretary Claytor protesting the Beech contract. On January 17, 1978, Secretary Claytor responded to Meyer's letter of December 5, 1977, advising Meyer that he remained firmly convinced that the Department of Defense will benefit from the use of a common utility transport aircraft by the four military services. In that letter, Secretary Claytor stated:

> Procurement of the C–12 represents a sound business approach to achieve increased utility transport aircraft commonality among the military departments. Military testing of the C–12 has demonstrated that it will provide a known performance capability. Operation of the C–12 will allow the Navy and the Marine Corps to take advantage of the contractor logistic support system already established for the Army and the Air Force.

Secretary Claytor stated in an affidavit filed in this action that he based his decision to purchase the Beech plane on the considerations outlined in his November 29, 1977, and January 17, 1978, letters to Meyer, quoted above.

On February 10, 1978, Cessna retained counsel for the purpose of intervening in the *Metzenbaum* action filed on February 2.

---

**10.** ASPR 5–1106.3(a)(1), 32 C.F.R. 5–1106.-3(a)(1), provides that when coordinated procurement is by negotiation, the Procuring Department shall make the required determinations and findings on the basis of information furnished by the Requiring Department.

Cessna never sought an opinion from the General Accounting Office about the Navy-Beech purchase contract for CTX aircraft.

An affidavit by Harold J. Hart, Jr., filed here on behalf of the Navy, states *inter alia* that it is estimated that the cost to the Navy of operating the planes which the CTX aircraft are to replace is $12,000 per day more than the cost of operating the Beech C–12; that due to provisions in the Beech contract adjusting the price in accordance with changes in certain economic indicators, each day of delay increases the cost of the CTX program by $14,000; that delay in the replacement of the aircraft now in use increases the safety hazard to Navy personnel; and that were it necessary for the Navy to stop work on the Beech contract for more than 90 days, the Navy would be exposed to a breach of contract action or would have to terminate the contract at an estimated cost of $2,000,000.

An April 19, 1978, affidavit by E. C. Nikkel, Beech vice president for aerospace programs, states that Beech has invested 800 hours of engineering work, 500 hours of production planning, and 375 hours of production scheduling, and that Beech has issued binding purchase orders for the engines, propellers, electrical motors and landing gear assemblies for 22 planes, commenced preparation of a written logistic support plan, released shop orders for fabrication of in-house parts, and reserved factory production line positions for 22 aircraft.

The Navy requires that "all aircraft are to possess FAA Type and Airworthiness Certifications at the time proposals are submitted." As the result of an accident involving a Cessna plane, the airworthiness certificates for four planes of the type which Cessna would sell the Navy if it were awarded a contract to supply CTX aircraft were suspended from November 18, 1977, until February 23, 1978.

For many years Cessna has been engaged in the business of manufacturing and selling aircraft. In 1974 Cessna unsuccessfully protested to the General Accounting Office (GAO) the Army/Air Force award to Beech of contracts to supply their equivalent of CTX aircraft. The GAO identified delay in Cessna's protest as one reason for its denial of Cessna's challenge. *Cessna Aircraft Company-Beech Aircraft Corporation,* 54 Comp.Gen. 97 (1974), 74–2 CPD ¶ 91.

## II. *Conclusions of Law*

### A. *Standing*

■ This Court has jurisdiction under 28 U.S.C. § 1331 over an action by Cessna, an airplane manufacturer and would-be CTX supplier, to declare illegal and to enjoin performance of a contract between the Navy and Cessna's competitor entered without formal advertising allegedly in violation of the Armed Services Procurement Act, 10 U.S.C. § 2031 *et seq. Scanwell Laboratories, Inc. v. Schaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). Cessna has standing because of its interest in supplying these CTX planes to the Navy. That standing was not eliminated by the temporary impairment of Cessna's ability to bid for the 22 plane contract as a result of FAA suspension of the certificates of airworthiness of four planes of the type for which Cessna hoped to sell.

### B. *Laches*

■ Neither of the defendants has alleged or proved that threat of irreparable injury which would support a defense of laches. They have not alleged that a decision holding the contract illegal and enjoining its performance would prevent procurement of the CTX aircraft in the time necessary for Navy operational purposes. Beech has failed to show irreversible commitments of funds or other resources in reliance on the contract sufficient to offset the damage to the public interest which would result from condoning a contract let illegally without formal advertising or other competition required by the Armed Services Procurement Act.

### C. *Merits*

The decision of the official defendants to purchase the Army/Air Force plane and that competitive bidding was impracticable

was made formally in two stages. Secretary Claytor decided for the Navy to purchase and use the plane previously purchased and in use by the Army and the Air Force. When the Navy requested the Army to contract on the Navy's behalf for the planes, the Army made a Determination and Finding that formal advertising was "impractical." [11]

According to the affidavit of Secretary Claytor, in the course of making his decision he concluded that Congress intended that the Navy purchase the plane in use by the Army and Air Force. He, thereafter, made the decision to procure the Army/Air Force plane entirely on the Navy's operational needs and the expressions of Congressional guidance. In addition to the evidence of Congressional intent, Secretary Claytor considered Navy operational needs, sound business judgment, the known performance of the Army/Air Force plane, and most importantly, the fact that the Navy purchase of the Army/Air Force plane would allow the Navy to share the contractor support already established for the Army and the Air Force. As explained, and undisputed, Navy use of the Army/Air Force plane would enable the Navy to use the contractor support and service in place at Army/Air Force bases worldwide. Purchase of any other plane would limit Navy access to that support.

Once the Navy decided to purchase the Army/Air Force plane, Beech was the only source of the services and supplies. The Army determination followed, therefore, that it was impractical to obtain competition by formal advertising for the supplies and service requested by the Navy.

This Court's review of the legislative history of the Authorization Act and the Appropriation Act for the Navy's 1978 budget leads to the conclusion, contrary to Secretary Claytor's, that Congress as a body did not decide that the Navy was required to purchase the plane previously purchased and used by the Army and the Air Force.

Both the Authorization Act and the Appropriation Act are silent on the subject. The only document evidencing any decision by Congress as a body is the House-Senate Conference Report on the 1978 Authorization.[12] That document neither directs nor purports to direct Navy purchase of the Army/Air Force plane. Further, that report contains no mention of advertising, competition, or the Armed Services Procurement Act.

Defendants cite numerous other congressional statements by committees and individuals regarding the authorization and appropriation of funds for the Navy CTX. It is apparent that none of these statements, separately or in combination, had the legal effect of either directing the Navy to purchase the Army/Air Force plane or suspending the duty of the official defendants to advertise formally or otherwise permit competition if it were feasible or practicable to do so. The official defendants were therefore not entitled to base their decision to procure the plane used by the Army and Air Force without formal advertising or competition upon anything said or done in Congress. If the official decision to dispense with formal advertising and competition was valid, it was valid because the Navy had discretion to require the common plane.

 The record shows that the official defendants relied for their decision to buy the Army/Air Force plane upon at least one legally sufficient consideration: the ability to have the Navy planes serviced at the existing worldwide Army and Air Force bases. This was a reasonable ground for the decision. The law requires no more. *See Aul Instruments, Inc.,* 77–1 CPD ¶ 461 (B–186854; June 29, 1977); *The Lawyers Co-Operative Publishing Co.,* 77–1 CPD ¶ 432 (B–188799; June 15, 1977). *See also,* as to the authority of decisions of the Comptroller General, *Wheelabrator Corp. v. Chafee,* 147 U.S.App.D.C. 238, 248, 455 F.2d

---

11. In these circumstances there is no significant difference between "impractical" and "impracticable."

12. S.Rep.No.95–282, 95th Cong., 1st Sess. 21 (1977).

1306, 1316 (1971). It is therefore unnecessary to consider or decide the hypothetical question of whether the official defendants would have reached the same conclusion if Congress had been completely silent on the subject or if they had not misread the decision of Congress.

No statute or regulation cited by either party or discovered by the Court requires, or even suggests, that a formal finding is a necessary predicate to a valid military selection decision of the kind at issue here. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 417–421, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Secretary Claytor's litigation affidavit recapitulated his statements contemporaneous to his decision. *See Id.* at 419, 91 S.Ct. 814. Those statements unambiguously recorded his decision and a sufficient reason for it. The Secretary's contemporaneous statements furnish an adequate basis for the limited judicial review authorized in a military procurement case like this. Assuming the Navy's selection of the Beech plane was permissible, the Determinations and Findings prepared by the Army comply with the formal requirements of 10 U.S.C. § 2310(b) that such a Determination and Finding "clearly and convincingly establish . . . that formal advertising would not have been feasible and practicable."

This was a military procurement. The official defendants' decision, as it related to the use of Army/Air Force support, had a significant military operational ingredient. This Court's review of procurement decisions generally should be quite restrained. *See M. Steinthal v. Seamans,* 147 U.S.App. D.C. 221 at 233–34, 455 F.2d 1289 at 1301–03. All the reasons for that restraint compound in a review of a military procurement decision of the nature and dimension of this one. As the Senate Armed Services Committee said when it reported on the provision in the Armed Services Procurement Act which permits officials to dispense with formal advertising determined to be impracticable:

In approving this section the committee is aware that there has been a long line of strict interpretations placed upon contracts or purchases made where agencies felt it was impracticable to secure competition. . . . However, this section is intended to place the maximum responsibility for decisions as to when it is impracticable to secure competition in the hands of the agency concerned. The experiences of the war and contracts negotiated since the war in the fields of stevedoring, ship repairs, chartering of vessels, where prices are set by law or regulations, or where there is a single source of supply, have shown clearly that the competitive-bid advertising method is not only frequently impracticable but does not always operate to the best interests of the Government. It is, therefore, intended that this section should be construed liberally and that the review of these contracts should be confined to the validity and legality of the action taken and should not extend to reversal of bona fide determinations of impracticability *where any reasonable ground for such determination exists.*[13] (Emphasis added.)

The determination by the official defendants that the Navy should buy and use the Army/Air Force plane and that formal advertising was impracticable was not "a clear and prejudicial violation" of the Armed Services Procurement Act. *See Kentron Hawaii, Ltd. v. Warner,* 156 U.S.App.D.C. at 277, 480, F.2d at 1169. Accordingly, the defendants' motions for summary judgment will be granted, the plaintiff's motion will be denied, and judgment will be separately entered for defendants.

---

**13.** S.Rep.No.571, 80th Cong., 1st Sess. (1947), reprinted in [1948] U.S.Code Cong.Serv. 1948, pp. 1048, 1055.