ORBAS & ASSOCIATES, Plaintiff,

v.

**SECRETARY OF the NAVY, Defendant.**

**No. CIV–S–94–0377–DFL–JFM.**

United States District Court,
E.D. California.

June 8, 1994.

William L. Bruckner, Corona & Balistreri, San Diego, CA, for Orbas.

Kate Warner, Law Offices of John W. Rosenberg, San Rafael, CA, for Arntz Builders.

Edmund F. Brennan, Asst. U.S. Atty., Sacramento, CA, for Secretary of the Navy.

### MEMORANDUM OF DECISION AND ORDER

LEVI, District Judge.

An evidentiary hearing was held in this case on April 28, 1994. At the close of the hearing, both parties agreed that the hearing shall constitute the trial on the merits of this action. *See* Fed.R.Civ.P. 65(a)(2). This memorandum of decision constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### I

On August 11, 1993, Naval Facilities issued an Invitation for Bids in the construction of a Child Development Center at Travis Air Force Base.[1] The submitted bids were to include prices for the base bid and three options. Potential bidders were instructed that the Navy would evaluate the bids for award purposes based on the sum of the base bid and the three options, but that the Navy would not necessarily exercise any of the

---

1. IFB N62474–92–B–3497.

options. The bids were received and publicly opened on September 14, 1993.

Plaintiff Orbas submitted the lowest total bid, $2,750,000. This bid was $345,000 lower than the Navy's estimate, and $542,582 lower than the bid from Arntz General Construction ("Arntz"), to whom the contract was eventually awarded.[2] When the bids were compared, it was revealed that Orbas' bid was 11% lower than the Navy's estimate and 17% lower than Arntz's bid. At the same time, Orbas' bids on options 1 and 3 were significantly higher than the Navy's estimate and the rest of the bids. These disparities led the contracting officer, Barbara–Ann Bycsek, to question the accuracy of Orbas' bids. Following the procedure provided at 48 C.F.R. § 14.406–1, Bycsek contacted Orbas and requested that Orbas review its worksheets for possible errors or omissions. (Ex. 8.) If Orbas determined its bid price to be correct as submitted, Orbas was to provide written confirmation of its bid and provide a cost breakdown of the bid by specification sections. The contracting officer emphasized the importance of receiving Orbas' response by September 17, 1993. No response was received, so Bycsek telephoned Orbas on September 17 and again on September 20. Each time Bycsek was told that Orbas was waiting for confirmation from its bonding company before confirming its bid. During the September 20 conversation, Mrs. Orbas inquired whether all of the options would be awarded. Bycsek informed her that no decision had been made concerning the options. Mrs. Orbas then informed Bycsek that an error had been made in its bid, because certain costs, in the amount of "approximately" $120,000, had been allocated to option 3 instead of to the base bid. Mrs. Orbas ended the conversation with a promise to provide a definitive answer by the early morning of September 21, 1993.

Orbas did not respond by its own deadline. On September 23, 1993, Orbas sent a letter by facsimile to the contracting officer stating simply:

> At this point in time, upon review of Orbas & Associates' bid for this contract, it does not appear that a mistake has been made. However, the bonding company is reviewing the job and it is expected that their response will be forthcoming this afternoon or at the latest tomorrow.

(Ex. 9.)

Bycsek replied to this letter by facsimile alerting Orbas that its response did not adequately address the Navy's concerns. (Ex. 10.) Bycsek established a deadline of 12:00 p.m., September 24, 1993, for a proper response "including bid confirmation, bid breakdown, worksheets and a list of references with telephone numbers." Orbas confirmed its bid by facsimile at 11:48 a.m., September 24, 1993. Attached to the letter were "summary worksheets, contract history and references." (Ex. 11.) The facsimile did not include the requested bid breakdown and original, pre-bid worksheets.

A bid verification meeting was scheduled for September 28, 1993, between Orbas and the contracting officer and her staff. In the confirmation letter, Orbas was reminded that its representative must bring "the originals and copies of all worksheets/data used in the development" of the bid. (Ex. 12.) The parties differ as to what occurred at the verification meeting. Defendant contends that Orbas' representative, Richard Legere, was not able to adequately respond to the Navy's questions and did not have the appropriate original worksheets and other materials with him at the meeting. Legere testified that he answered all of the Navy's questions; clarified Orbas' intent to confirm its bid, whether or not the Navy allowed Orbas to correct its misallocation of $120,000 to option 3 rather than to the base bid; and brought the original worksheets and other

---

**2.** Arntz Builders submitted the third lowest bid, but the second lowest bidder withdrew its bid after an error was discovered.

The breakdown of the bids was as follows:

| Bidder | Base Bid | Option 1 | Option 2 | Option 3 | Total |
| --- | --- | --- | --- | --- | --- |
| Navy's Est. | $2,860,000 | $ 44,000 | $177,000 | $ 14,000 | $3,095,000 |
| Orbas | 2,396,000 | 110,000 | 110,000 | 134,000 | 2,750,000 |
| Arntz | 3,163,000 | 48,174 | 68,900 | 12,508 | 3,292,582 |

materials with him, but no one ever asked to see them.

Based on this meeting, Bycsek found that a mistake had been made in Orbas' bid and rejected the bid. (Ex. 13.) The rejection was based upon Orbas' "failure to provide adequate documentation, namely original worksheets to support the basis of [its] bid, as well as [Orbas'] inability to adequately demonstrate, when questioned during the bid verification meeting, how [Orbas] would perform the work within the price bid." (*Id.*) In light of the large disparity between Orbas' bid and the government estimate and other bids, the contracting officer determined that acceptance of Orbas' bid would be unreasonable and unfair to other bidders. (*Id.*) The contract, consisting of the base bid and options 1 and 2, was awarded to the next lowest bidder, Arntz General Construction, on September 29, 1993.

Orbas filed a protest with the Comptroller General, and a stop work order was issued to Arntz until the General Accounting Office ("GAO") made its decision denying the protest on February 25, 1994. In its decision, the GAO found that the contracting officer had acted reasonably in light of unexplained disparities between Orbas' "worksheet" and its bid, the unexplained disparities between its bid and the government's estimates, and the unsubstantiated claim of error concerning option 3. The Acting General Counsel particularly stressed Orbas' failure to substantiate its bid:

> A bid may be rejected as mistaken where there is a price disparity between the bid and the other bids received and the government estimate, and where the bidder has failed to furnish sufficient documentation to substantiate its bid calculations when so requested.... Despite several opportunities to explain the price disparities, Orbas elected to submit only a "worksheet" that was created after bid opening and thus not relied upon for the preparation of the bid, whose limited information did not enable the agency to determine why the significant price disparities existed or whether the bid included all the cost

elements required under the solicitation. Further, Orbas chose to ignore the agency's requests for an explanation of its bid calculations, and was unable to substantiate these calculations at the bid verification meeting. Even now, in its submissions filed during the pendency of this protest, Orbas does not take the opportunity to substantiate its bid calculations.... Acceptance of the bid under these circumstances effectively would allow the bidder to decide, after bid opening, whether to stand by its bid, or to admit a mistake, as its own best interests dictate. Permitting such an election is not fair to other bidders whose prices have been disclosed at bid opening.

*In re Orbas & Assocs.*, B–255276, 1994 WL 58975, at *5 (Comp. Gen.), 94–1 Comptroller Procurement Decisions 139 (Feb. 23, 1994).

After the GAO denied Orbas' requested relief, Orbas filed this suit. The court denied Orbas' motions for temporary restraining order and preliminary injunction, but agreed to hold an expedited evidentiary hearing specifically to determine whether Orbas' representative had complied with the contracting officer's directives by bringing the original bid worksheets to the bid verification meeting. At the April 28, 1994 hearing, the court heard testimony from three witnesses for plaintiff and five witnesses for defendant on a wider range of issues. At the close of the hearing, both parties agreed that the hearing would serve as a trial on the merits and post-trial briefs were submitted.

## II

Plaintiff has standing to sue as a disappointed bidder on a government procurement contract. *See Parola v. Weinberger*, 848 F.2d 956, 959 (9th Cir.1988) (citing *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970)) (additional citations omitted). However, Orbas bears "a heavy burden of showing either that (1) the procurement official's decision on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable

statutes or regulations." *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir. 1973) (citations omitted). "A procurement decision is not 'irrational' simply because [the court] might have reached a different decision in the first instance." *Elcon Enters., Inc. v. Washington Metro. Area Transit Auth.,* 977 F.2d 1472, 1478 (D.C.Cir.1992) (citations omitted). Courts are especially reluctant "to interfere with the executive procurement process where, as here, the General Accounting Office has made a determination upholding the procurement officials on the merits." *M. Steinthal & Co., Inc. v. Seamans,* 455 F.2d 1289, 1304 (D.C.Cir.1971). The court must, therefore, defer to the GAO's finding unless it is arbitrary or capricious. *See id.* at 1305.

### III

Orbas asserts that Bycsek's decision to reject its offer was arbitrary and capricious or lacked a rational basis. Bycsek and the GAO based their decisions on three factors: (1) the significant price disparities between Orbas and the other bidders and the government's estimate; (2) the alleged mistake concerning option 3 which was not verified; and (3) Orbas' failure to substantiate its bid calculations before or during the bid verification meeting. *See Orbas,* 1994 WL 58975 at *3. In these circumstances, Bycsek and the GAO concluded that to award the contract to Orbas would be unfair to other bona fide bidders. *See* 48 C.F.R. § 14.406–3(g)(5). "A contracting officer's decision to reject an apparently mistaken bid under [48 C.F.R. §] 14.406–3(g)(5) is subject to question only where it is shown to be unreasonable." *In re Pamfilis Painting, Inc.,* B–237968, 1990 WL 277856, at *2 (Comp. Gen.), 90–1 Comptroller Procurement Decisions 355 (Apr. 3, 1990) (citations omitted).

### A. *Mistake*

■ Under the federal regulations, a contracting officer is required to examine all bids for potential mistakes. 48 C.F.R. § 14.406–1. If a mistake is discovered, or if the contracting officer suspects that a mistake has been made, the officer is required to alert the bidder to the suspected mistake,

and to request a verification of the bid. *Id.* While it is true that award of a contract to a below cost bidder is not legally precluded, *In re R.P. Sita, Inc.,* B–217027, 1985 WL 52195 (Comp.Gen.), 85–1 Comptroller Procurement Decisions 39 (Jan. 14, 1985), a large discrepancy between the low bid and the other bids or the government's estimate is sufficient to put the contracting officer on notice of possible error. *In re PNM Construction, Inc.,* B–215973, 1984 WL 47010 (Comp. Gen.), 84–2 Comptroller Procurement Decisions 590 (Nov. 30, 1984). Here, Orbas' aggregate bid was 11% lower than the government's estimate and 17% lower than Arntz's bid. Additionally, Orbas' base bid was 16% lower than the government's estimate while its option 3 bid was 957% higher than the government's estimate. Based on these discrepancies, Bycsek reasonably suspected a mistake and took the appropriate steps. She contacted Orbas, notified Orbas that its bid was significantly lower, as required by 48 C.F.R. § 14.406–3(g)(1)(i), and requested verification.

Once a mistake is suspected, it is treated either as a "clerical mistake" or as "other mistakes disclosed before award." *See* 48 C.F.R. §§ 14.406–2, 14.406–3.

■ Orbas first argues that all that has been shown is one "clerical mistake" in placing the price of kitchen equipment in option 3 instead of in the base bid. Because this was a "mere clerical error," according to Orbas, it was irrational for Bycsek not to allow Orbas to correct its bid or to simply "transfer" the extra $120,000 from option 3 to the base bid. However, neither of these options was within the contracting officer's discretion under 48 C.F.R. § 14.406–2. First, a misunderstanding of the requirements of the base bid and option 3 does not fall within the definition of "clerical mistake." *See* 48 C.F.R. § 14.406–2. *Cf. In re TLC Financial Group,* B–237384, 1990 WL 277616 (Comp.Gen.), 90–1 Comptroller Procurement Decisions 116 (Jan. 26, 1990) (misinterpretation of the IFB's requirements treated as non-clerical error). Second, before a contracting officer may correct a clerical mistake, she "shall obtain from the bidder a verification of the bid intended." 48 C.F.R. § 14.406–2(a). Orbas never veri-

fied the original bid or the error, and never specified in writing the true amount of the error. Even now, Orbas can only narrow the amount of the error to "approximately $120,-000." (P.'s Reply to D.'s Post–Trial Brief at 1, 2, & 7.)

▮ Orbas next argues that there was no "mistake" at all, because the bids were to be evaluated "based upon the total bid price." (*Id.* at 1.) This is a misstatement of the Instructions to Bidders:

> the Government will evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement.

(P.'s Trial Ex. 5 at p. 2, § 1.2(d).) Nothing in the instruction requires the Navy to overlook an unsubstantiated mistake in one of the options because the total bid may be "approximately" correct.

Moreover, Orbas assumes that the only relevant suspected mistake concerned the option 3 bid. Certainly, that potential error was important to the contracting officer. But there were other suspected errors as well. The very disparity between Orbas' bid and the other bids, including the government's estimate, alerted the officer that other errors could well be present. And the contracting officer had reason to question specific components of Orbas' bid that appeared inconsistent with the sub-contractor bids Orbas had obtained.[3]

▮ In summary, there was ample evidence before the Contracting Officer that Orbas' bid could contain significant non-clerical errors.

## B. *Verification*

Once a bidder has been notified of a suspected non-clerical mistake, the bidder must take action to verify its bid that is "sufficient to reasonably assure the contracting officer that the bid as confirmed is without error ..." 48 C.F.R. § 14.406–3(g)(1).

▮ Orbas argues that all that is required to "verify" a bid is the bidder's statement that there is no mistake and its promise to perform. This is simply not the case. The government is required to reject an obviously erroneous bid, even if confirmed by the bidder. *TLC Financial Group,* 1990 WL 277616 at *2.

▮ Bycsek reasonably found that Orbas had failed to verify its bid. In making her request for verification, Bycsek specifically asked Orbas to provide a cost breakdown of its bid. After failing to adhere to numerous deadlines, Orbas finally provided Bycsek with a written "confirmation" of its bid supplemented with summary worksheets that had been prepared post-bid, possibly to submit to its bonding company. Bycsek was not unreasonable, arbitrary, or capricious in determining that these documents were insufficient to verify Orbas' bid.

▮ Moreover, Orbas was then required to attend a confirmation meeting to verify the bid. At the evidentiary hearing, a number of witnesses testified on the question of whether Orbas provided the proper documentation at this meeting to verify its bid. The evidence overwhelmingly shows that Orbas did not. At least three government witnesses recall that Orbas' representative, Richard Legere, specifically stated that he had not brought the original documents with him. Furthermore, the claim by Orbas that Legere had the worksheets is directly contradicted by its briefing to the GAO. (Ex. D.) Indeed, the claim was not raised until Orbas' reply brief in its briefing on its motion for preliminary injunction in this court. (*See* March 30, 1994, Mem. of Op. & Order at 10.) The belated character of the claim casts doubt on the accuracy of Legere's recollection. The court finds that if Legere had the original worksheets in his physical possession at the meeting, which is most unlikely, he never presented them to the Navy's representatives even after Team I Counsel Liotta specifically asked for them.

---

**3.** For example, Team Leader Zigant testified that Orbas recorded a subcontractor bid for purchasing food service equipment of $160,000; whereas in Orbas' bid, the amount is stated as $120,000.

As Orbas could not produce this equipment itself, this discrepancy raised a reasonable inference that a mistake had been made. There were other such discrepancies.

The testimony also shows that Legere was ill-prepared for the meeting and could not answer many of the questions put to him by Zigant that particularly focused on differences between subcontractor bids obtained by Orbas and the corresponding Orbas estimate for the same work. This finding is in keeping with the testimony of Ron and Sallie Orbas and Legere that Orbas thought that the meeting was a "mere formality" and that Legere attended the meeting as a mere "courtesy." This was an error in judgment on the part of Orbas which cannot be charged to the Navy. Given the specificity of the Navy's document requests in preparation for the meeting, Orbas had notice that its representative should be prepared to discuss the preparation and calculation of its bid in detail and should present for review the original bid preparation documents. In light of these circumstances, the contracting officer's decision that she was not "reasonably assure[d] ... that the bid as confirmed [was] without error," 48 C.F.R. § 14.406–3(g)(1), was not irrational.

### C. § 14.406–3(g)(5)

Having properly determined that Orbas failed to verify its bid, the Navy could reject the bid if it were out of line with other bids or the government's estimate (subpart i), or if there were other clear indications of error (subpart ii). *See* 48 C.F.R. § 14.406–3(g)(5)(i) and (ii).[4]

■ Orbas argues that the disparity between its total bid and the government estimate was not significant. Orbas' total bid was 11% lower than the Navy's estimate and 17% lower than Arntz's total bid. While Orbas may have been awarded contracts with greater disparities in the past, a determination of what is "so far out of line" on a particular contract is a matter particularly committed to the agency and contracting officer's discretion. Such a determination requires an intimate knowledge of the requirements and flexibility of the contract. For example, where a contract requires purchasing pre-made goods, which should lead to a narrow range of bids, the contracting officer may determine that disparities of less than 10% may still be "so far out of line" that acceptance would be unfair.

In addition, the contracting officer could reasonably have relied upon the significant disparities in Orbas' bids on options 1 and 3 in making her determination. As stated above, the Navy was required to evaluate total bids for award purposes, but could examine individual options when evaluating possible errors.

■ The contracting officer's decision that the disparity between Orbas' bid and the other bids and the government's estimate was so far out of line that acceptance of the unverified bid would be unfair was not unreasonable; furthermore, the GAO's upholding of that decision was not arbitrary or capricious. *Cf. Pamfilis,* 1990 WL 277856 at *2; *M. Steinthal,* 455 F.2d at 1305.

■ Bycsek's decision was also supported by subpart ii of 48 C.F.R. § 14.406–3(g)(5). The contracting officer was faced with a very low bid, with significant disparities in two of the three options, a company that failed to respond to numerous requests for verification, a nonresponsive representative at the specially-set bid verification meeting, unexplained discrepancies between portions of Orbas' bid and the subcontractor bids submitted to Orbas, and the lack of original bid worksheets. In these circumstances, Bycsek reasonably concluded that there were "indications of error so clear" that Orbas' bid ought not be accepted. The decision to deny award of the contract to Orbas was fully rational and reasonable. *See* 48 C.F.R. § 14.406–3(g)(5)(i) & (ii); *Pamfilis,* 1990 WL 277856; *TLC Financial Group,* 1990 WL

---

4. The regulation, in full, provides:

Where the bidder fails or refuses to furnish evidence in support of a suspected or alleged mistake, the contracting officer shall consider the bid as submitted unless (i) the amount of the bid is so far out of line with the amounts of other bids received, or with the amount estimated by the agency or determined by the contracting officer to be reasonable, or (ii) there are other indications of error so clear, as to reasonably justify the conclusion that acceptance of the bid would be unfair to the bidder or to other bona fide bidders. Attempts made to obtain the information required and the action taken with respect to the bid shall be fully documented.

277616; *cf. Elcon,* 977 F.2d at 1482 ("a decision to award the contract to a higher-cost but more experienced contractor is not irrational").

## IV

For the reasons stated above, the court affirms the decisions of the contracting officer and the GAO. Judgment on the merits shall be entered in favor of the defendant.

IT IS SO ORDERED.